KRONISH LIEB WEINER & HELLMAN LLP         <u>Hearing Date</u>:  July 19, 2004 at 10:00 a.m.

1114 Avenue of the Americas

New York, NY 10036

(212) 479-6000

Jay R. Indyke (JI 0353)

Richard S. Kanowitz (RK 0677)


Co-Counsel for Old UGC, Inc.

Debtor and Debtor in Possession


UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

In re:

                                                    Chapter 11

OLD UGC, INC.

                          Debtor.                   Case No. 04-10156 (BRL)


------------------------------------------------------------ X


**JOINT OPPOSITION TO OPENING BRIEF BY FRANK MORROW,**
**TRUSTEE, ON ESTIMATION OF CLAIM OF THE AT HOME**
**GENERAL UNSECURED CREDITORS LIQUIDATING**
**<u>TRUST AND MEMORANDUM OF LAW IN SUPPORT</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................. iii

TABLE OF EXHIBITS ................................................................................... viii

PRELIMINARY STATEMENT ..........................................................................1

STATEMENT OF FACTS ..................................................................................3

RELIEF REQUESTED AND REASONS THEREFOR ......................................8

A.    The At Home Claim Should Be Estimated At Zero ...................................8

B.    The At Home Claim Was Released Under The UPC Plan. .....................10

C.    At Home's Claim Is Subject To Subordination As A Damages
      Claim Arising From The Purchase Of Securities Of An Affiliate
      Of The Debtor, And Thus The General Unsecured Portion Should
      Be Estimated At Zero.............................................................................14

D.    At Home's Failure To Disclose The Cause Of Action In Its Own
      Bankruptcy Bars The At Home Claim On The Grounds Of Res
      Judicata And Judicial Estoppel .............................................................18

E.    The Trustee Cannot Enforce Its Alleged Contract...................................24

      (1)    The Debtor Never Signed the Trustee's Version of the Contract...24

      (2)    The Debtor Terminated the MTA, Without Any Subsequent
             Ratification of the MTA..............................................................24

      (3)    The MTA's Conditions to Closing Never Occurred .....................27

F.    The Debtor Neither Owed Nor Breached Any Fiduciary Duties To
      At Home..................................................................................................29

G.    The Trustee's Predecessor Suffered No Recoverable Damages ...............34

      (1)    The MTA Bars Substantially All of the Trustee's Claimed
             Damages.....................................................................................34

      (2)    At Home Suffered No "Benefit of the Bargain" Losses as a
             Result of the Failed Transaction ..................................................36

             (a)    The Debtor's Alleged Failure to Close the Deal did not
                    Proximately Cause any Damages......................................37

i

(b)    The Trustee's Alleged Proof of Damages Is Too
Speculative ........................................................................40

(c)    Lost Expectation Damages in the Billions Were
Not Contemplated by the Parties .......................................43

(3)    The Trustee is Not Entitled to Its Claimed Reliance Damages .....46

(4)    The Trustee Is Not Entitled to Punitive Damages ........................50

CONCLUSION ..............................................................................................................50

## TABLE OF AUTHORITIES

## CASES

Addison v. Langton (In re Brints Cotton Marketing, Inc.),
    737 F.2d 1338 (5th Cir. 1984) ..................................................................8, 9
Alleyne v. Four Seasons Hotel - New York,
    2001 WL 135770 (S.D.N.Y. Feb. 15, 2001)....................................................35
America Broad. System, Inc. v. Nugent (In re Betacom of Phoenix, Inc.),
    240 F.3d 823 (9th Cir. 2001)...................................................15, 16, 17
Ameritech Information System, Inc. v. Bar Code Resources,
    331 F.3d 571 (7th Cir. 2003) ...............................................................25
Arell's Fine Jewelers, Inc. v. Honeywell, Inc.,
    170 A.D.2d 1013, 566 N.Y.S.2d 505 (4th Dep't 1991)....................................36
Aroneck v. Atkin,
    90 A.D.2d 966, 456 N.Y.S.2d 558 (4th Dep't 1982).......................................39
In re Baldwin-United Corp.,
    55 B.R. 885 (Bankr. S.D. Ohio 1985).......................................................9
Banco Espirito Santo de Investimento v. Citibank, N.A.,
    2003 WL 23018888 (S.D.N.Y. Dec. 22, 2003) .............................................33
Barada Hill Investments, Ltd. v. Telegroup, Inc. (In re Telegroup),
    281 F.3d 133 (3d Cir. 2002) ...............................................................15
Bausch & Lomb, Inc. v. Bressler,
    977 F.2d 720 (2d Cir. 1992)...........................................................37, 47
Benson v. RMJ Securities Corp.,
    683 F. Supp. 359 (S.D.N.Y. 1988).........................................................25
Bittner v. Borne Chemical Co.,
    691 F.2d 134 (3d Cir. 1982)............................................................9, 10
Blank v. Baronowski,
    959 F. Supp. 172 (S.D.N.Y. 1997)..........................................................31
Browning v. Levy,
    283 F.3d 761 (6th Cir. 2002) .............................................................20
Bunn v. Frontier Airlines, Inc. (In re Frontier Airlines, Inc.),
    137 B.R. 811 (D. Colo. 1992)...............................................................9
Central District Physician's Health Plan v. O'Higgins,
    951 F. Supp. 352 (N.D.N.Y. 1997)..........................................................26
Charter Crude Oil Co. v. Petroleos Mexicanos (In re Charter Crude Oil Co.),
    125 B.R. 650 (M.D. Fla. 1991) ...........................................................13
Chemetron Corp. v. Jones,
    72 F.3d 341 (3d Cir. 1995)................................................................12
In re Chicago Pacific Corp.,
    773 F.2d 909 (7th Cir. 1985) .........................................................12, 14
City of New York v. New York, N.Y. & A.R. Co.,
    344 U.S. 293 (1953) ......................................................................11

D&K Properties Crystal Lake v. Mutual Life Insurance Co.,
112 F.3d 257 (7th Cir. 1997) .........................................................20, 23
In re Drexel Burnham Lambert Group,
151 B.R. 674 (Bankr. S.D.N.Y. 1993) .......................................12, 13
Durkee v. Mott,
8 Barb. 423 (N.Y. Gen. Term 1850) .........................................49
Economist's Advocate, LLC v. Cognitive Arts Corp.,
2004 WL 728874 (S.D.N.Y. Apr. 7, 2004) ..............................24, 26
Energy Capital Corp. v. United States,
302 F.3d 1314 (Fed. Cir. 2002)...................................................37
First City Beaumont v. Durkay (In re Ford),
967 F.2d 1047 (5th Cir. 1992) ...................................................8, 9
In re Flanigan's Enterprises, Inc.,
77 B.R. 963 (Bankr. S.D. Fla. 1987).........................................12
Fouse v. Shelly,
63 S.E. 208 (W. Va. 1908)...........................................................31
Freund v. Washington Square Press, Inc.,
34 N.Y.2d 379, 314 N.E.2d 419, 357 N.Y.S.2d 857 (1974)...........37
Frito-Lay, Inc. v. LTV Corp. (In re Chateaugay Corp.),
156 B.R. 391 (S.D.N.Y. 1993)....................................................9
Goldin Associates, L.L.C. v. Donaldson, Lufkin & Jenrett Securites Corp.,
2004 WL 1119652 (S.D.N.Y. May 20, 2004) ................................20
Grant v. U.S. Home Corp. (In re U.S.H. Corp.),
223 B.R. 654 (Bankr. S.D.N.Y. 1998).......................................11, 12
Gross v. Sweet,
49 N.Y.2d 102 (1979) .................................................................35
Hansen Bancorp, Inc. v. United States,
53 Fed. Cl. 92 (2003).................................................................47
Herrick Co. v. Vetta Sports, Inc.,
1996 WL 691993, 1996 U.S. Dist. LEXIS 17841 (S.D.N.Y Aug. 2, 1996)....................31
Holm v. C.M.P. Sheet Metal, Inc.,
89 A.D.2d 229, 455 N.Y.S.2d 429 (4th Dep't 1982)......................26
Hudson Motors Partnership v. Crest Leasing Enterprises,
845 F. Supp. 969 (E.D.N.Y. 1994) .............................................50
In re Interco,
137 B.R. 993 (Bankr. E.D. Mo. 1992) .......................................8
Interfilm, Inc. v. Advanced Exhibition Corp.,
249 A.D.2d 242, 672 N.Y.S.2d 309 (1st Dep't 1998).....................46
Jorgensen v. Century 21 Real Estate Corp.,
217 A.D.2d 533, 629 N.Y.S.2d 268 (2d Dep't 1995).....................37
In re Kaplan,
186 B.R. 871 (Bankr. D.N.J. 1995) ...........................................9
Katz v. I.A. Alliance Corp. (In re I. Appel Corp.),
300 B.R. 564 (S.D.N.Y. 2003)....................................................20
Kelley v. South Bay Bank (In re Kelley),
199 B.R. 698 (9th Cir. B.A.P. 1996)..........................................20

iv

Kenford Co. v. County of Erie,
    67 N.Y.2d 257, 493 N.E.2d 234, 502 N.Y.S.2d 131 (1986)............................37, 42, 43, 44

Kunica v. St. Jean Financial, Inc.,
    233 B.R. 46 (S.D.N.Y. 1999).........................................................................................21

Layden v. Boccio,
    253 A.D.2d 540, 686 N.Y.S.2d 763 (2d Dep't 1998).....................................................33

Lernout & Hauspie Speech Products, N.V. v. Baker (In re Lernout & Hauspie
Speech Products, N.V.),
    264 B.R. 336 (Bankr. D. Del. 2001) .............................................................................17

Leroy v. Paytel,
    1992 WL 367090 (S.D.N.Y. Nov. 24, 1992)................................................................31

Levine v. Personnel Institute, Inc.,
    138 N.Y.S.2d 243 (N.Y. Sup. Ct. New York County 1954)..........................................30

Lucente v. International Business Machines Corp.,
    310 F.3d 243 (2d Cir. 2002).........................................................................................39

Mathias v. Jacobs,
    238 F. Supp. 2d 556 (S.D.N.Y. 2002)...........................................................................43

McKinley Allsopp, Inc. v. Jetborne International, Inc.,
    1990 WL 138959 (S.D.N.Y. Sept. 19, 1990)...............................................................46

Metropolitan Life Insurance Co. v. Noble Lowndes International, Inc.,
    192 A.D.2d 83, 600 N.Y.S.2d 212 (1st Dept. 1993),
    aff'd, 643 N.E.2d 504 (N.Y. 1994)..........................................................................34, 35

Meyers v. Waverly Fabrics Division,
    65 N.Y.2d 75, 479 N.E.2d 236 (N.Y. 1985), 489 N.Y.S.2d 891 (1985) ........................33

Mullane v. Central Hanover Bank & Trust Co.,
    339 U.S. 306, 70 S. Ct. 652 (1950)..........................................................................11, 14

Najjar Industries v. City of New York,
    87 A.D.2d 329, 451 N.Y.S.2d 410 (1st Dep't 1982) .....................................................41

New York University v. Continental Insurance Co.,
    87 N.Y.2d 308, 662 N.E.2d 763, 639 N.Y.S.2d 283 (1995)...........................................33

Peluso v. Tauscher Cronacher Professional Engineers, P.C.,
    270 A.D.2d 325, 704 N.Y.S.2d 289 (2d Dep't 2000) .....................................................35

Precision Testing Labs, Ltd. v. Kenyon Corp. of America,
    644 F. Supp. 1327 (S.D.N.Y. 1986)..............................................................................29

R.C. Gluck & Co. v. Tankel,
    24 Misc. 2d 841, 199 N.Y.S.2d 12 (N.Y. New York County 1960)................................32

RUS, Inc. v. Bay Industrial, Inc.,
    2004 WL 1240578 (S.D.N.Y. May 25, 2004) ...............................................................39

Radtke v. East Mequon Business Park Ltd. Partnership,
    1997 WL 43476 (Wis. Ct. App. Feb. 5, 1997)..............................................................32

Raven Media Investments LLC v. DirecTV Latin America, LLC,
    2004 WL 302303 (D. Del. Feb. 4, 2004) ......................................................................15

Reuben H. Donnelley Corp. v. Mark I. Marketing Corp.,
    893 F. Supp. 285 (S.D.N.Y. 1995)................................................................................32

Rose Lee Manufacturing, Inc. v. Chemical Bank,
    186 A.D.2d 548, 588 N.Y.S.2d 408 (2d Dep't 1992).....................................................36

Rosenshein v. Kleban,
 918 F. Supp. 98 (S.D.N.Y 1996).......................................................................20, 23
Ryan v. Loui (In re Corey),
 892 F.2d 829 (9th Cir. 1989) ...........................................................................9
Schanbarger v. Edward Dott's Garage,
 72 A.D.2d 882, 421 N.Y.S.2d 937 (3d Dep't 1979) ......................................41
Schneider v. State of New York,
 38 A.D.2d 628, 327 N.Y.S.2d 60 (3d Dep't 1971) .........................................41
Schonfeld v. Hilliard,
 218 F.3d 164 (2d Cir. 2000)..............................................................................45
Scott v. Grinnell Mutual Reinsurance Co.,
 653 N.W.2d 556 (Iowa 2002) ...........................................................................46
Scholastic Inc. v. Harris,
 80 F. Supp. 2d 139 (S.D.N.Y. 1999)..................................................................33
Shove v. Siegbert,
 239 A.D. 334, 267 N.Y.S. 306 (1st Dep't 1933) ..............................................29
Shovel Transfer and Storage, Inc. v. Penn. Liquor Control Board,
 739 A.2d 133 (Pa. 1999) ....................................................................................46
In re Silverman,
 155 B.R. 362 (E.D.N.C. 1993).........................................................................32
Simon v. Safelite Glass Corp.,
 128 F.3d 68 (2d Cir. 1997)................................................................................21
Streamline Capital, LLC v. Hartford Casualty Insurance Co.,
 2003 WL 22004888 (S.D.N.Y. Aug. 25, 2003)................................... 36, 43-44
Sure-Snap Corp. v. State Street Bank & Trust Co.,
 948 F.2d 869 (2d Cir. 1991)......................................................................11, 19
Sweazey v. Merchants Mutual Insurance Co.,
 169 A.D.2d 43, 571 N.Y.S.2d 131 (3d Dep't 1991) ........................................44
Szatmari v. Rosenbaum,
 182 Misc.2d 232, 490 N.Y.S.2d 97 (N.Y. J. Ct. Westchester County 1985) ...................25
Tevdorachvili v. Chase Manhattan Bank,
 103 F. Supp. 2d 632 (E.D.N.Y. 2000) .................................................36, 42, 44
Thompkins v. Stuttgart School District #22,
 858 F.2d 1317 (8th Cir. 1988) ................................................................ 25-26
In re Thomson McKinnon Securities, Inc.,
 143 B.R. 612 (Bankr. S.D.N.Y. 1992)..............................................................9
In re Thomson McKinnon Securities, Inc.,
 191 B.R. 976 (Bankr. S.D.N.Y. 1996)..............................................................9
Tobias v. First National Bank and Trust Co.,
 709 F. Supp. 1266 (S.D.N.Y. 1989)..................................................................31
Trademark Research Corp. v. Maxwell Online, Inc.,
 995 F.2d 326 (2d Cir. 1993)..............................................................................44
Treasure Lake Association v. Oppenheim,
 993 F. Supp. 217 (S.D.N.Y. 1998)....................................................................37
Tulsa Professional Collection Services, Inc. v. Pope,
 485 U.S. 478 (1988).........................................................................................11

In re VF Brands, Inc.,
    275 B.R. 725 (Bankr. D. Del. 2002) ............................................................17
Wakeman v. Wheeler & Wilson Mfg. Co.,
    101 N.Y. 205, 4 N.E. 264 (1886)................................................................41
Webster v. DiTrapano,
    114 A.D.2d 698, 494 N.Y.S.2d 550 (3d Dep't 1985) ...................................39
Westfed Holdings, Inc. v. United States,
    52 Fed. Cl. 135 (2002) ................................................................................47
William Kaufman Organization, Ltd. v. Graham & James, LLP,
    269 A.D.2d 171, 703 N.Y.S.2d 439 (1st Dept. 2000)..................................33
Young v. Data Switch Corp.,
    646 A.2d 852 (Conn. 1994) .........................................................................26
Young v. Young,
    827 A.2d 722 (Conn. App. 2003) ................................................................25

## STATUTES

11 U.S.C. § 502(c) ..............................................................................................8
11 U.S.C. § 510(b) ............................................................................................15
11 U.S.C. § 1141(a) ..........................................................................................11

## OTHER AUTHORITIES

3 Am. Jur. 2d Agency § 183 .............................................................................26
22 Am. Jur. § 281 .............................................................................................45
15A N.Y. Jur. 2d Business Relationships § 1389 (2003) ..................................30
Restatement (Second) of Contracts § 349 (1979) .............................................46
Restatement (First) of Contracts § 406 (1932) .................................................25

## TABLE OF EXHIBITS

Spangler Declaration........Declaration of Ellen P. Spangler

Fries Declaration..............Declaration of Michael Fries

Tanabe Declaration ..........Declaration of Charles Y. Tanabe

Ruth Pirie Affidavit..........Affidavit of Ruth Pirie
                             Transcript of At Home December 4, 2000 Investor Relations Call

Braun Declaration ............Declaration of Richard S. Braun
                             Curriculum Vitae of Richard S. Braun
                             Report of Richard S. Braun

Seignette Declaration .......Declaration of Marc Seignette
                             Chello profit & loss, July-December, 2000
                             Chello profit & loss, 2001
                             Chello funding from UPC

Tab A ..............................Initial At Home Confirmation Hearing

Tab B..............................Chello Annual Report, 2000
                             Average Euro to U.S. Dollar exchange Rate

Tab C...............................At Home 10-K 2000 for year ending December 31, 2000

Tab D .............................July 18, 2000 Liberty Funding Commitment Letter and Term Sheet

Tab E..............................July 18, 2000 fax to Ellen Spangler

Tab F ..............................July 18, 2000 fax cover sheet from Ellen Spangler to Olivier Saba

Tab G .............................July 27, 2000 e-mail from Ellen Spangler to Douglas Getter
                             July 28, 2000 e-mail from Douglas Getter to Ellen Spangler

Tab H .............................UPC Plan of Reorganization

Tab I................................UPC Confirmation Order

Tab J...............................UPC Disclosure Statement

Tab K .............................At Home Schedule B

Tab L..............................UPC Affidavits of Publication

Tab M..............................UPC Orders Re: Notice

Tab N .............................Annex M to MTA

Tab O .............................At Home Disclosure Statement

Tab P ..............................At Home Confirmation Order and At Home Plan of Liquidation

Tab Q .............................Continued At Home Confirmation Hearing

Tab R..............................GUCLT Amended Complaint

Tab S ..............................GUCLT Proof of Claim

Tab T ................................At Home 10-Q/A Quarter Ending September 30, 2000

Tab U ...............................At Home Estate Representative Order and Motion

Tab V ...............................GUCLT Estate Litigation Expenses

Tab W...............................October 6, 2000 letter from John O'Farrell to Roger Lynch

Tab X ...............................UGC 10-K for year ending December 31, 2000

Tab Y ...............................August 7, 2000 e-mail from Mark Stevens to Ellen Spangler
                                     August 10, 2000 e-mail from Ellen Spangler to Nancy Egan
                                     August 17, 2000 e-mail from Ellen Spangler to Mark Stevens
                                     August 18, 2000 e-mail from Ellen Spangler to Mark Stevens
                                     August 18, 2000 e-mail from Mark Stevens to Ellen Spangler
                                     October 17, 2000 e-mail from Ellen Spangler to Nancy Egan
                                     October 18, 2000 e-mail from Mark Stevens to Ellen Spangler

Tab Z................................August 9, 2000 Dewey Ballantine MTA Closing Checklist
                                     October 3, 2000 Dewey Ballantine MTA Closing Checklist

Tab AA.............................September 1, 2000 letter from Mark Schneider to George Bell

Tab BB .............................November 21, 2000 memo from John Wilson to Douglas Getter

Tab CC .............................Transcript of Deposition of Jeffrey Dubin on June 15, 2004

**JOINT OPPOSITION TO OPENING BRIEF BY FRANK MORROW,
TRUSTEE, ON ESTIMATION OF CLAIM OF THE AT HOME
GENERAL UNSECURED CREDITORS LIQUIDATING
TRUST AND MEMORANDUM OF LAW IN SUPPORT**

TO THE HONORABLE BURTON R. LIFLAND,
UNITED STATES BANKRUPTCY JUDGE:

Old UGC, Inc., as debtor and debtor in possession (the "Debtor"), by and through

its co-counsel, Kronish Lieb Weiner & Hellman LLP, in accordance with the Consent Order

Scheduling Estimation Hearing (the "Consent Order"), responds to the brief filed by Frank

Morrow, as trustee (the "Trustee") of the At Home General Unsecured Creditors Liquidating

Trust ("GUCLT"), and respectfully represents the following:

## PRELIMINARY STATEMENT[1]

1.      Prepetition, the Debtor agreed with its largest creditors on the terms of a

comprehensive restructuring of its more than $1 billion in bond debt.  Recently, the Debtor

reached substantial agreement with the Official Unsecured Creditors' Committee (the

"Committee") on the principal terms for the proposed treatment of the Debtor's publicly-held

bond debt, subject to Court approval.  The only impediment to a consensual plan of

reorganization in this case is the proof of claim (the "At Home Claim") filed by the Trustee in an

amount that more resembles a telephone number than a legitimate damage claim.  The Debtor

requests that the Court estimate the At Home Claim at $0 so that the Debtor can promptly

implement its chapter 11 plan of reorganization.[2]

2.      The Trustee alleges here that the Debtor and certain of its affiliates, including

UnitedGlobalCom, Inc. ("United") and United Pan-Europe Communications N.V. ("UPC"),

---

[1]      This is styled as a Joint Opposition because it is joined by the Official Unsecured Creditors' Committee and
UnitedGlobalCom, Inc.  The estate's bankruptcy-related defenses to the claim are found in Sections B-D; whereas
the substantive New York-law defenses to the alleged claim appear in Sections E-G.

[2]      It is not the Debtor's intention to deprive the Trustee from the opportunity to vote on the Debtor's plan of
reorganization.  Accordingly, the Debtor does not object, by this estimation process, to the temporary allowance of
the At Home Claim in the amount of $1 for voting purposes under Fed. R. Bankr. P. 3018.

either breached the contract that allegedly gives rise to the At Home Claim or are liable for such alleged breach as a successor to the Debtor. However, for more than three years after At Home Corporation ("At Home") terminated that contract, no one ever made any demand on the Debtor or any of its affiliates under the contract or otherwise. This Court established a deadline for the submission of claims against UPC in UPC's bankruptcy case, but At Home never filed a claim. When this Court entered an order confirming UPC's plan of reorganization and releasing any UPC-related claims against it, United, and the Debtor, At Home again chose not to appear or object. When At Home filed its own schedules of assets and disclosure statement in its San Francisco bankruptcy case, it never disclosed the existence of any alleged claim against the Debtor, United, or UPC. And when the San Francisco bankruptcy court inquired as to whether equity security holders of At Home should be allowed to participate in recoveries on claims to be asserted by the Trustee, including the At Home Claim, the Trustee's predecessor responded: "We're going to do dumpster diving and who knows, in all those piles of manure, there may be a little pony hiding, but, you know, more than likely there won't be."[3]

3.     When the Trustee filed his proof of claim and related pleadings in this case, he asserted, for the first time, that the At Home Claim exceeds $2 billion. In support of his claim, the Trustee has proffered a lengthy brief of over 40 pages and a report from an econometrician with a doctorate in philosophy degree from the Massachusetts Institute of Technology. Curiously, the Trustee devoted almost two-thirds of his brief attempting to convince the Court that his claim arises from an enforceable contract with the Debtor while completely ignoring provisions of the contract that bar most, if not all, of the relief the Trustee seeks. Perhaps more interesting is that the Trustee's expert witness conceded that he is not an expert in business

---

[3]     Debtor's Ex. A, at 73:2-5 [Transcript of August 6, 2002 Hearing re: Confirmation of Debtors' Joint Chapter 11 Plan of Liquidation, filed on August 13, 2002, Docket No. 2523, at 69:2-5, (the "Initial At Home Confirmation Hearing").]

valuation or damages, and that all he did was to apply simple arithmetic to valuation numbers that he was supplied and did not verify in any way.  These circumstances are precisely those for which estimation under section 502(c) was designed—a viable reorganization should not be held hostage on account of a specious attempt at "dumpster diving."

4.      For the reasons more fully explained below, the Debtor has no liability on the At Home Claim because:

- UPC's plan of reorganization, confirmed by this Court, released the At Home Claim in full as a matter of law;

- the At Home Claim is a claim for damages arising from the purchase of equity securities of an affiliate of the Debtor, which must be subordinated under section 510(b) of the Bankruptcy Code;

- the At Home Claim is barred as a matter of law because At Home failed to schedule or disclose the At Home Claim in its own bankruptcy;

- the Trustee cannot enforce its alleged contract;

- the Debtor neither owed nor breached any fiduciary duties to the Trustee's predecessor; and

- the Trustee's predecessor suffered no recoverable damages.

## STATEMENT OF FACTS

5.      The Debtor never signed the contract that the Trustee is asking the Court to enforce.  Because that fact and others are lost in the Trustee's brief, the Debtor here responds to the Trustee's statement of facts solely to correct important inaccuracies.

6.      In the spring of 2000, as the Internet bubble was bursting, At Home, on the one hand, and the Debtor, and the Debtor's European affiliate, UPC, on the other, entered into negotiations to make relatively equal equity investments and contributions of assets in order to form a new enterprise to provide Internet access in Europe.  The negotiations led to many drafts of a Master Transaction Agreement ("MTA") that contemplated that the parties would form two

Netherlands-based companies, one public company called Excite chello N.V. and a limited partnership called Excite chello C.V.

7.      During the negotiations, the respective chief executives of At Home and UPC's subsidiary, chello broadband N.V. ("chello"), planned an elaborate inter-continental press conference to announce the proposed transaction to the public markets in New York and London on the afternoon of July 18, 2000 (London time).  As the time for the announcement approached, key issues relating to the MTA remained unresolved.

8.      Among other issues, the critical threshold component of the transaction for the Debtor was a €200,000,000 investment by Liberty Media Corporation ("Liberty"), without which the transaction simply was not viable.[4]  Both chello and At Home's international assets had been losing large sums of money and there was no immediate prospect of profitability in the near future.[5]  This substantial infusion of capital was essential for the potential success of the merger. Thus, the Debtor viewed Liberty's financial contribution as necessary for the new enterprise to have any chance of becoming financially viable.[6]

9.      On the evening of July 17, 2000, mere hours before the planned announcement, Liberty's representative, Charles Tanabe, refused to agree to a legally binding commitment by

---

[4]      Declaration of Ellen P. Spangler ¶ 3; Declaration of Michael Fries ¶ 3.

[5]      Debtor's Ex. B-4 to B-5, B-42 [chello broadband annual report for year 2000, at 4-5, 23 (indicating an accumulated deficit of €96 million ($254 million), and net losses of €139.9 million ($119 million) for 1999 and €144 million ($123 million) for 2000, converted using the average exchange rate from Oct. 1 to Dec. 5, 2000); Trustee's Ex. 34, at 3 (At Home's international assets had a $35.4 million operating loss for the second half of 2000). Declaration of Mark C. Stevens in support of Trustee's Opening Brief ¶ 2; see also Trustee's Ex. 35, at 8 (Morgan Stanley projected losses for the combined entity of $290.1 million in CY2000, $377.1 million in CY2001, and $54.8 million in CY 2002); Debtor's Ex. C-15, C-34, to C-35 [At Home 10-K for year ending Dec. 31, 2000, at 15, 34 (indicating accumulated deficit of $9.1 billion and no operating profit since existence, stating At Home expected to incur "significant net losses for the foreseeable future," and reporting operating losses of $144 million for 1998, $1.4 billion for 1999, and $7.4 billion for 2000)].

[6]      Fries Decl. ¶ 4.

4

Liberty to contribute the required funds to the new enterprise.[7]  This decision was made

independent of any input from the Debtor.[8]  Mr. Tanabe simply was not prepared to commit

Liberty to invest such a large sum of money when he had not yet seen definitive documents and

was not fully apprised of the capital structure of the proposed new enterprise.[9]  Once Liberty

stated that it would not make a binding commitment, the Debtor determined that it would not

agree to an MTA that would have required closing absent Liberty's funding commitment.[10]

10.     As a direct consequence, the Debtor's general counsel, Ellen P. Spangler,

immediately insisted that a new condition precedent be added to the MTA—at Section 3.02

("Conditions to Obligations of all Parties") on page 17—to make clear that the Debtor's

obligation to close could only be triggered by the availability of the necessary funding from

Liberty.[11]

11.     Consistent with Spangler's request, the MTA was revised (at page 17) to include

the availability of funding from Liberty as an express condition to the closing (the "Liberty

Condition").[12]  The only signature page for the MTA submitted on behalf of the Debtor was

made expressly subject to the inclusion of the Liberty Condition in the MTA.  Wrote Spangler,

"Attached is the Liberty Commitment Letter and the Signature page for the Master Agreement,

---

[7]      Declaration of Charles Y. Tanabe ¶¶ 5-7; Debtor's Ex. D-2 [Liberty Commitment Letter and Term Sheet dated July 18, 2000].

[8]      Tanabe Decl. ¶ 12.

[9]      Tanabe Decl. ¶ 5.

[10]     Spangler Decl. ¶¶ 3-4.

[11]     Spangler Decl. ¶ 4; Declaration of Nancy Egan in Support of Trustee's Opening Brief ¶ 9 ("issues arose with respect to Liberty Media's funding commitment when Liberty delivered its commitment letter").

[12]     Spangler Decl. ¶ 5; Debtor's Ex. E-1 [Fax to Ellen Spangler of revised page 17 of MTA].

*which is being transmitted to you on the understanding that the revised page 17 is part of the Agreement.*"[13]

12.     When the time for the press conference arrived, although all of the open issues were not resolved, the parties' respective chief executives elected to make the announcement. Shortly after the announcement, the Debtor learned that there was a different MTA one stating that the Liberty Condition would expire ten days following the July 18, 2000 signing of the MTA.[14]  Of course, as soon as the Debtor became aware that At Home believed that the Liberty Condition would expire within ten days, the Debtor communicated unambiguously that the Debtor would not proceed under the MTA without the satisfaction of the Liberty Condition.[15] Ultimately, the parties agreed to continue to work together to resolve this and other important business differences underlying the transaction before the November 30, 2000 deadline for closing.[16]

13.     Ultimately, the transaction never closed because they could not resolve these differences and not all conditions precedent to closing occurred within the time frames specified in the MTA.  Among other things, the Debtor had no duty to close by the November 30, 2000

---

[13]     Trustee's Ex. 6 [July 18, 2000 fax from Ellen Spangler, at 1 (emphasis added)]; Debtor's Ex. F-1 [Fax confirmation including cover page].  It cannot be disputed that this reference to page 17 refers to the Liberty Condition.  There was no other change on that page and subsequent proposed revisions to § 3.02 (never shown to or agreed to by the Debtor) all appeared on pages other than page 17.  (Trustee's Ex. 3, at 17 [MTA first version 8]; Trustee's Ex. 4, at 18 [MTA second version 8]; Trustee's Ex. 5, at 19 [MTA version 9].)  Nancy Egan, At Home's representative, concedes that when she received Spangler's signature, this cover sheet with its limiting language was attached.  (Egan Decl. ¶ 20; Trustee's Ex. 6 [July 18, 2000 fax from Ellen Spangler, at 1].)  Moreover, the Trustee's Ex. 6 shows Spangler's signature on page 66 of the first version 8 of the MTA (which contains the original Liberty funding condition, without any 10-day limitation).  (Trustee's Ex. 6 [July 18, 200 fax from Ellen Spangler, at 10].)  The MTA that the Trustee seeks to enforce has unexecuted signature blocks on page 68 of version 9 of the MTA.  (Trustee's Ex. 5 [Final Master dated July 18, 2000 and marked version 9, at 68 of the MTA].)

[14]     Spangler Decl. ¶ 9.

[15]     Spangler Decl. ¶¶ 9-11; Debtor's Ex. G-1 [July 27, 2000 email from Spangler to Getter].

[16]     Spangler Decl. ¶¶ 14, 18, 23-24; Trustee's Ex. 5 [MTA § 8.01(B), at 60-61 (entitling At Home or UPC to terminate the MTA "if the Closing hereunder has not occurred prior to November 30, 2003 (the 'Drop-Dead Date')")].

deadline due to material adverse changes that occurred with respect to At Home after July 18, 2000.[17] The MTA defined "Material Adverse Change" as "any change or circumstance affecting a relevant Person that has had or could reasonably be expected to have a Material Adverse Effect on such Person."[18]

14.    At Home's own expert, Jeffrey A. Dubin, opines that the value of its international assets and the market generally for equity investments in Internet companies dropped considerably between July 18, 2000 and November 30, 2000.[19] Dubin stated that, in his view, the international assets were likely no longer viable as a going concern as of December 2000.[20] This massive decline in the value of At Home's international assets, combined with the adverse market conditions for internet public offerings generally at that time, effectively closed the door to the initial public offering contemplated by § 6.21 of the MTA[21] and rendered that transaction "economically unfeasible."

15.    In fact, At Home itself terminated the proposed transaction by early December 2000,[22] and the parties never contributed any equity or assets to the new enterprise. Although At Home's termination letter contained a boilerplate reservation of rights, the letter and At Home's same-day private and public statements did not suggest that At Home believed the Debtor or UPC were in breach, nor did such communications make any demand on the Debtor and UPC for

---

[17]    Trustee's Ex. 5 [MTA § 3.04(e), at 21].

[18]    Under the MTA, "'Material Adverse Effect' means any effect on a Person that, individually or in the aggregate with any other circumstances, changes, in or effects on, such Person: (a) is, or is reasonably like to be, materially adverse to the business, operations, or financial condition of such Person taken as a whole, (b) materially and adversely affects the ability of such Person to conduct its business substantially in the manner in which it is currently operated, or (c) would render impossible or economically unfeasible any of the transactions contemplated by this Agreement and the other Basic Agreements." (Trustee's Ex. 5 [MTA § 1.01, at 8-9].)

[19]    Dubin Report, at 15; Dubin Report Ex. 9.

[20]    Dubin Report at 15 n.35; Dubin Depo. at 196:13-15.

[21]    Trustee's Ex. 5 [MTA § 6.21, at 55].

[22]    Trustee's Ex. 27 [December 4, 2000 letter from Nancy Egan to Ellen Spangler and Ton Tuijten].

money or to remedy any alleged breach. Instead, At Home publicly stated that it "would leap at the opportunity of working with UPC in the future . . . ."[23] Privately, At Home's CEO wrote that he appreciated UPC's efforts to propose alternatives and that At Home "remain[s] willing to discuss market opportunities with you in the future."[24]

### RELIEF REQUESTED AND REASONS THEREFOR

**A.    The At Home Claim Should Be Estimated At Zero.**

16.    In accordance with the Consent Order, the Debtor requests that the Court enter an order under sections 105 and 502(c) of the Bankruptcy Code estimating the At Home Claim at $0. In relevant part, section 502(c) of the Code provides that:

> There <u>shall be estimated</u> for purposes of allowance . . . any contingent or unliqui-dated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case . . . .

11 U.S.C. 502(c) (emphasis added).

17.    Courts have uniformly held that estimation is mandatory where the claims in question are contingent[25] or unliquidated[26] and actual liquidation would unreasonably delay the administration of the case. <u>See, e.g.</u>, <u>Addison v. Langton (In re Brints Cotton Mktg., Inc.)</u>, 737 F.2d 1338, 1340 (5th Cir. 1984) ("In enacting the Bankruptcy Code of 1978, Congress intended that all claims, including unliquidated and contingent claims be 'dealt with' in the bankruptcy proceeding.").

---

[23]    Transcript of Excite@Home Investor Relations Conference Call on December 4, 2000, at 1, which is attached to the Affidavit of Ruth Pirie (the "At Home Investor Call").

[24]    Trustee's Ex. 29 [December 4, 2000 email from George Bell to Mark Schneider].

[25]    A claim is contingent if the debt is one which the debtor will be called upon to pay only upon the occurrence or happening of an extrinsic event which will trigger the liability of the debtor to the alleged creditor and if such triggering event or occurrence was one reasonably contemplated by the debtor and creditor at the time the event giving rise to the claim occurred. <u>First City Beaumont v. Durkay  (In re Ford)</u>, 967 F.2d 1047, 1051 (5th Cir. 1992).

[26]    A claim is unliquidated if it is not subject to "ready determination and precision in computation of the amount due" or "capable of ascertainment by reference to an agreement or by simple computation." <u>In re Interco</u>, 137 B.R. 993, 997 (Bankr. E.D. Mo. 1992) (citations omitted).

18.     Bankruptcy courts have broad discretion to select whatever method is best suited to the particular facts and circumstances in order to prevent undue delay in the administration of a case.  Frito-Lay, Inc. v. LTV Corp. (In re Chateaugay Corp.), 156 B.R. 391, 403 (S.D.N.Y. 1993); see also In re Thomson McKinnon Sec., Inc., 191 B.R. 976, 989 (Bankr. S.D.N.Y. 1996) (estimating court has wide discretion to pick among myriad options available to liquidate claim); Bittner v. Borne Chem. Co., 691 F.2d 134, 135 (3d Cir. 1982) ("whatever method is best suited to the particular contingencies at issue"); Brints Cotton Mktg., 737 F.2d at 1341 ("whatever method is best suited to the circumstances") (quoting 3 Collier on Bankruptcy ¶ 502.03, at 502-77 (15th ed. 1983)); In re Kaplan, 186 B.R. 871, 873 (Bankr. D.N.J. 1995) (following Bittner); In re Baldwin-United Corp., 55 B.R. 885, 899 (Bankr. S.D. Ohio 1985) (same).  "'Estimation . . . simply means that the bankruptcy court may exercise [its] discretionary powers in accordance with the principles of equity."  Ford, 967 F.2d at 1049 n.3.

19.     These discretionary powers include estimating claims at zero if the proceedings demonstrate that the creditor cannot establish the validity of its claim by a preponderance of the evidence.  See, e.g., Bittner, 691 F.2d at 136; Ryan v. Loui (In re Corey), 892 F.2d 829 (9th Cir. 1989) (estimating "highly speculative" claims at zero); Bunn v. Frontier Airlines, Inc. (In re Frontier Airlines, Inc.), 137 B.R. 811, 814 (D. Colo. 1992) ("there is nothing in the statutory language which indicates that the estimation must yield a positive value of the claim").  Based on this standard, the Kaplan court estimated guarantee claims at zero after finding that the guaranteed party "most likely would not succeed on a state court action."  186 B.R. at 878. Likewise, when the FDIC failed to establish its misrepresentation claims by a preponderance of the evidence in In re Thomson McKinnon Sec., Inc., 143 B.R. 612 (Bankr. S.D.N.Y. 1992), the estimating court therefore disallowed them "as having no value."  Id. at 618, 621.

20.    This method is particularly appropriate where the size of the alleged claim would undermine the reorganization process, notwithstanding that a court likely would ultimately decide against the claim after the reorganization.[27]  The interests of those creditors with liquidated claims would be subject to the interests of those who might eventually have no claim at all.  See Bittner, 691 F.2d at 137.  If the Trustee cannot demonstrate that he can prove his case by a preponderance of the evidence, his claim should be valued at zero.

**B.    The At Home Claim Was Released Under The UPC Plan.**

21.    UPC filed its own chapter 11 case on December 3, 2002, a little more than two years after the date that At Home terminated the MTA.  During the first quarter of 2003, this Court confirmed UPC's plan.[28]  Among other things, the terms of the UPC Plan and the UPC Confirmation Order released the Debtor from any "Claim," as defined under the Bankruptcy Code, that a holder of a "Claim" against UPC might be entitled to assert, whether for contract or otherwise, based on any transaction relating to UPC.[29]  To the extent that At Home has a claim against the Debtor, it also must have held a claim against UPC, because under the express terms of the MTA, UPC was directly responsible for contributing the chello assets to the new enterprise.  Moreover, any claims for breach of the MTA must "relate" to UPC because UPC was

---

[27]    Here, even if the At Home Claim were estimated to have a value of two percent of its alleged amount, it would dwarf the claims of the Debtor's legitimate outside creditors.

[28]    Debtor's Ex. H contains a copy of that plan, which is entitled "Second Amended Chapter 11 Reorganization Plan Jointly Proposed by United Pan-Europe Communications N.V. and New UPC, Inc.," and the "First Modifications to Second Amended Chapter 11 Plan of Reorganization Jointly Proposed by United Pan-European Communications N.V. and New UPC, Inc." (collectively, the "UPC Plan").  Debtor's Ex. I contains a copy of this Court's confirmation order, which is entitled "Findings of Facts, Conclusions of Law, and Order Under Section 1129 of the Bankruptcy Code and Rule 3020 of the Bankruptcy Rules Confirming Second Amended Chapter 11 Plan of Reorganization Jointly Proposed by United Pan-Europe Communications N.V. and New UPC, Inc. as Modified," (the "UPC Confirmation Order").  The UPC Plan became effective on September 3, 2003.

[29]    Debtor's Ex. H-22, H-55 to H-56, H-73 [UPC Plan § 1.1 (definition of "UGC"), § 1.2 (definition of "Claim"), § 12.4(a) (release), ¶ 7 of First Modifications]; Debtor's Ex. I-26 to I-29 [UPC Confirmation Order, at ¶20(a)]; see also Debtor's Ex. J-104 to J-106 [Second Amended Disclosure Statement with Respect to Second Amended Chapter 11 Plan of Reorganization Jointly Proposed by United Pan-Europe Communications N.V. and New UPC, Inc." (the "UPC Disclosure Statement")].

10

a party to the MTA.  Because UPC was subject to the same allegations now made by the Trustee

for breach of the MTA and breach of fiduciary duties, the release in the UPC Plan encompassed

the At Home Claim.

22.     The Trustee is bound by the UPC Plan because a confirmed plan binds every

creditor even if a particular creditor is unaware of the bankruptcy, provided that the debtor has

"given notice sufficient to satisfy due process."  Grant v. U.S. Home Corp. (In re U.S.H. Corp.),

223 B.R. 654, 657-58 (Bankr. S.D.N.Y. 1998); see also 11 U.S.C. § 1141(a) ("the provisions of a

confirmed plan bind . . . any creditor"); Sure-Snap Corp. v. State Street Bank & Trust Co., 948

F.2d 869, 873 (2d Cir. 1991) ("Once confirmed, the plan binds the debtor and all creditors,

whether or not the creditor has accepted the plan").  Due process requires that creditors receive

notice that is "reasonably calculated, under all the circumstances, to apprise interested parties of

the pendency of the action and afford them an opportunity to present their objections."  Mullane

v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950); see also U.S.H., 223 B.R. at

658.

23.     In bankruptcy, due process requirements are satisfied when the debtor gives

publication notice to creditors who are unknown to the debtor.  U.S.H., 223 B.R. at 658 (citing

Mullane, 339 U.S. at 317 (finding that constructive notice by publication is reasonable notice to

unknown persons whose rights may be foreclosed by a final decree); City of New York v. New

York, N.Y. & H.R. Co., 344 U.S. 293, 296 (1953) (holding that when interests of persons are

unknown, "plain necessity" may cause a resort to publication)).  Unknown creditors are those

who are not known to the debtor and could not be reasonably ascertained by the debtor through

reasonably diligent efforts.  Tulsa Prof. Collection Servs., Inc. v. Pope, 485 U.S. 478, 490

(1988); see also Mullane, 339 U.S. at 317; U.S.H. Corp., 223 B.R. at 659.

24.     "Reasonably diligent" efforts, however, do not require a vast, open-ended investigation, nor is the debtor under a duty to search out each conceivable, speculative, or conjectural claim.  U.S.H. Corp., 223 B.R. at 659; Chemetron Corp. v. Jones, 72 F.3d 341, 346 (3d Cir. 1995).  Rather, the search required is a careful examination of the debtor's books and records to ascertain its creditors with known claims.  See U.S.H., 223 B.R. at 659.  "A known claim arises from facts that would alert a reasonable debtor to the possibility that a claim might reasonably be filed against it."  In re Drexel Burnham Lambert Group, 151 B.R. 674, 681 (Bankr. S.D.N.Y. 1993).

25.     Thus, "a debtor need not notify all entities with which it has had contractual relations."  Id. at 682.  For example, a former contract party that fails to notify a debtor of amounts allegedly due under the contract is properly considered an unknown creditor.  See, e.g., In re Flanigan's Enterprises, Inc., 77 B.R. 963 (Bankr. S.D. Fla. 1987).  In that case, the debtor cancelled an insurance contract that required the debtor to pay additional premiums depending on the post-cancellation reconciliation of open and unreported claims.  The bankruptcy court found that when the debtor filed bankruptcy 22 months after the cancellation, the carrier was an unknown creditor because it had failed to send any reconciliation statement to the debtor during those 22 months.  Id. at 964-66.

26.     Even a creditor's prepetition communication demanding payment does not necessarily make the creditor known.  Drexel, 151 B.R. at 681.  The totality of circumstances as they later exist, during bankruptcy, may reflect that the debtor reasonably believed that the parties had subsequently resolved the dispute, that the creditor later concluded that it had no claim, or that the creditor had abandoned the claim, see, e.g., In re Chicago Pac. Corp., 773 F.2d 909, 916 (7th Cir. 1985) (trustee reasonably believed that plaintiff no longer asserted claim

because trustee and debtor had been dismissed as defendants in lawsuit); <u>Charter Crude Oil Co.</u>

<u>v. Petroleos Mexicanos (In re Charter Crude Oil Co.)</u>, 125 B.R. 650, 654 (M.D. Fla. 1991)

(remanding to bankruptcy court to determine whether debtor should have known of claim in light

of creditor's two-year silence after payment demand).

27.     As noted above, At Home never made any claim or demand based on the MTA,

never requested that the Debtor or UPC close under the MTA, never made any demand for

payment as a consequence of any alleged breach, and never took any actions whatsoever to

remedy any purported breach.  Therefore, when UPC filed its bankruptcy petition two years

later, on December 3, 2002, UPC's books and records disclosed no facts suggesting that the At

Home Claim "might reasonably be filed against it."  <u>Drexel Burnham Lambert</u>, 151 B.R. at 681.

Ironically, At Home itself neglected to list the At Home Claim as an asset in its own

bankruptcy.[30]  Accordingly, At Home was an unknown creditor of UPC.[31]

28.     UPC's notices by publication were reasonably calculated under all the

circumstances to apprise unknown creditors such as At Home of the UPC bankruptcy and

opportunities to object.  Specifically, UPC published notice of the commencement of the case,

claims bar date, and disclosure statement hearing in national and international editions of the

Wall Street Journal, in two Dutch newspapers of general circulation, the <u>Het Financeele Dagblad</u>

and the <u>NRC Handelsblad</u>, and a Luxembourg newspaper, the <u>Luxembourger Wort</u>.[32]  UPC

published notices of the confirmation hearing and of the UPC Confirmation Order in the global

---

[30]     Debtor's Ex. K-5, K-29 [At Home's "Schedule B – Personal Property," filed on November 5, 2001, Docket No. 349 (disclosing no contingent or unliquidated claim regarding the MTA)].

[31]     It is likewise undisputed that At Home never appeared, filed a claim, or took any other action to preserve its alleged claim against UPC or against the Debtor before the end of September 2003.

[32]     Debtor's Ex. L-1 to L-15 [Copies of the affidavits of publication filed in the UPC case].

edition of the Wall Street Journal, as well as the same three European publications.[33]  This Court

authorized these notices by publication, found that they were adequate and sufficient, and

determined that no other notice was required to discharge the claims of any unknown creditors

who did not file a claim in the bankruptcy.[34]

29.    The notices of the UPC bankruptcy were therefore sufficient to alert At Home to

the need to protect its claim, for it "is the part of common prudence for all those who have any

interest in [a thing], to guard that interest . . . ."  Mullane, 339 U.S. at 316 (quoting The Mary, 13

U.S. 126, 144 (1815)).  Considering all the circumstances, notice by publication to a

sophisticated unknown creditor was constitutionally sufficient notice to satisfy due process and

enforce the terms of the UPC Plan against At Home.  See, e.g., Chicago, 773 F.2d at 911-12 (7th

Cir. 1985) (notice of confirmation hearing effective to bind unknown creditor to plan that

discharged debtor and trustee overseeing estate).

**C.**    **At Home's Claim Is Subject To Subordination As A Damages Claim Arising From The Purchase of Securities of an Affiliate of the Debtor, And Thus The General Unsecured Portion Should Be Estimated At Zero.**

30.    The At Home Claim should be estimated at zero to reflect the amount thereof that

would constitute a general unsecured claim against the Debtor after this Court gives effect to the

mandatory subordination provisions of section 510(b) of the Bankruptcy Code.[35]  The At Home

---

[33]    Debtor's Ex. L-17 to L-32 [Copies of the affidavits of publication filed in the UPC case].

[34]    Debtor's Ex. M-4 to M-5, M-9, M-14, M-19, M-21 ["Order Pursuant to Fed. R. Bankr. P. 3003 and 2002 (A) Fixing Deadline and Establishing Procedures for Filing Proofs of Claim and (B) Approving Form and Manner of Service of Notice Thereof" ¶¶ 8-10; "Order (A) Scheduling Hearing to (i) Consider Adequacy of the Disclosure Statement and (ii) Approve Solicitation and Tabulation Procedures, (B) Approving Form and Manner of Notice and (C) Establishing Objection Deadlines and Procedures for Objections to Disclosure Statement and Solicitation and Tabulation Procedures" ¶¶ 3, 5; and "Order (A) Approving (i) Adequacy of Disclosure Statement and (ii) Solicitation and Tabulation Procedures, (B) Establishing Voting Record Date, (C) Establishing Voting Deadline, (D) Scheduling, and Approving Form and Manner of Notice of, Hearing to Confirm Plan and (E) Establishing Deadline and Procedures for Objections to Confirmation of the Plan" ¶¶ 1, 18, 22]; Debtor's Ex. I-4 to I-5 [UPC Confirmation Order ¶¶ H, O].

[35]    That section provides that a "claim for rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor [or] for damages arising from the purchase of sale of  such a security . . . shall be subordinated

Claim is a mere lost equity investment, or at best a damage claim arising from an anticipated equity investment in an affiliate of the Debtor, and thus should be accorded the same priority as other equity interests.

31.     Section 510(b) advances the policy that shareholders and other residual claimants that made an equity investment bear the risk of unlawful or other actionable conduct, bankruptcy, and other events that result in the loss of share value. <u>Raven Media Invs. LLC v. DirecTV Latin Am., LLC</u>, 2004 WL 302303, at *3 (D. Del. Feb. 4, 2004) (citing <u>Barada Hill Invs., Ltd. v. Telegroup, Inc. (In re Telegroup)</u>, 281 F.3d 133, 142 (3d Cir. 2002)).

> Congress intended to prevent disaffected equity investors from recouping their investment losses in parity with general unsecured creditors in the event of bankruptcy.  . . .  The fact that claimants chose to invest in equity rather than debt instruments suggests that they preferred to retain the right to participate in profits, and with it, the risk of losing their investment if the business failed.

<u>Telegroup</u>, 281 F.3d at 142.  In short, this rationale for mandatory subordination arises from the "dissimilar risk and return expectations of shareholder and creditors . . . ." <u>Am. Broad. Sys, Inc. v. Nugent (In re Betacom of Phoenix, Inc.)</u>, 240 F.3d 823, 830 (9th Cir. 2001).

32.     The At Home Claim satisfies the section 510(b) requirements for mandatory subordination.  First, the claim arose from a purchase of a "security."  Section 101(49)(A) of the Bankruptcy Code defines "security" as including a note, stock, bond, and <u>pre-organization</u> . . . <u>subscription</u>.  The MTA required At Home to subscribe for and purchase convertible notes and ordinary and preferred shares of Excite chello, N.V.[36]  At the close of the proposed transaction,

---

to all claims that are senior to or equal the claim or interest represented by the security, except that if such security is common stock, such claim has the same priority as common stock."  11 U.S.C. § 510(b).

[36]     Specifically, the MTA required At Home to form a subsidiary called Excite Holdings Corporation which would subscribe for and pay cash for 50% of the preferred and ordinary shares in a newly-formed Dutch public company with limited liability to be named Excite chello N.V. Excite chello N.V. would use that cash to subscribe for and buy a general partnership interest in a newly-formed Dutch limited partnership to be named Excite chello C.V.  Then, both At Home and Excite Holdings Corporation would cause the transfer of certain assets and subsidiaries directly and indirectly to Excite chello C.V. in exchange for 50% of its limited partnership units.  At Home also committed to buy €100,000,000 of convertible notes to be issued by Excite chello N.V. The Debtor and

At Home and the Debtor would each directly own €100,000,000 of convertible notes and indirectly own 50% of Excite chello N.V.  These convertible notes and ordinary and preferred shares fall within the Bankruptcy Code definition of security.

33.     Second, the At Home Claim "arises from the purchase . . . of an equity security" as that phrase is used in section 510(b), even though At Home did not complete its purchase of Excite chello N.V.'s securities and never became a shareholder of Excite chello N.V.  "Nothing in § 510(b)"s text requires a subordinated claimant to be a shareholder."  <u>Betacom</u>, 240 F.3d at 829.  And as the inclusion of "pre-organization subscription" within the definition of a "security" makes clear, a contract to subscribe for shares falls within section 510(b)'s purview.  A completed purchase or sale of securities is not necessary.  Moreover, the "risk analysis embodied in § 510(b) makes just as much sense in the . . . situation [where the claimant never received stock certificates] as it does in the situation of a claimant who physically received her stock certificates, but was defrauded into purchasing them."  <u>Id.</u>  at 830.  Thus, in <u>Betacom</u>, where the creditors alleged that they were not shareholders because the merger at issue never closed, the Ninth Circuit held that their claims nevertheless were "for damages surrounding the sale or purchase of a security . . . ."  <u>Id.</u> at 829-31.  For the same reasons, At Home's and the Debtor's failure to close the MTA transactions did not change the fact that the At Home Claim arose out of the MTA, under which At Home subscribed to purchase Excite chello N.V. securities.

34.     Finally, the Trustee's damages claim arose from a purchase of securities of the Debtor's "affiliate" (as that term is defined in the Bankruptcy Code), namely, Excite chello N.V.  "The language of section 510(b) applies equally to claims arising from purchase of the stock of

---

its then subsidiary UPC would undertake a similar set of steps, so that they would own the other 50% of the limited partnership interests in Excite chello C.V. and the preferred and ordinary shares in Excite chello N.V.  In exchange, the newly-formed chello Holdings would contribute chello and its subsidiaries to Excite chello C.V. and the Debtor likewise committed to buy €100,000,000 of Excite chello N.V.'s convertible notes.  (Trustee's Ex. 5 [MTA §§ 2.03, 3.01(b), at 18-19]; Debtor's Ex. N [Annex M of the MTA].)

an affiliate, including a subsidiary, of the debtor as it does to the purchase of stock of the debtor itself." In re VF Brands, Inc., 275 B.R. 725, 727 (Bankr. D. Del. 2002); see also Lernout & Hauspie Speech Products, N.V. v. Baker (In re Lernout & Hauspie Speech Prods., N.V.), 264 B.R. 336, 343  (Bankr. D. Del. 2001) (finding when subordinating claim against debtor-subsidiary, fact that claimant did not hold securities in debtor-subsidiary was irrelevant when it held securities in affiliate, the debtor-parent).  Section 101(2)(b) of the Bankruptcy Code defines "affiliate" as a "corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor . . . ."  Here, Excite chello N.V., if formed, would have been an affiliate of the Debtor because of the Debtor's indirect 50% ownership interest in that entity.  Just as section 510(b) applies to claimants who never received stock because the purchase was never completed, it likewise applies to claims based on stock of affiliates that were never formed because the investment was never completed. See Betacom, 240 F.3d at 829-31 (stating that section 510(b) applies even if transaction never completed).

35.    In summary, At Home negotiated the MTA as a vehicle for itself, the Debtor, and UPC to make an equity investment in a new enterprise.  As such, At Home took on the risks inherent in any equity investment –  the loss of its contributed capital – and obtained the possibility of profits far exceeding its investment.  At Home's alleged damages are the same as if At Home in fact had purchased the securities at the start of the negotiations and had rescinded the transaction at their conclusion, successfully re-acquiring its assets after their value had decreased.  Thus, the Trustee seeks damages arising from At Home's agreement to buy securities of the Debtor's affiliate, Excite chello N.V.  The Trustee's claim is therefore subject to mandatory subordination under section 510(b) in its entirety because the Trustee should not be permitted to

boot-strap At Home's failed equity investment in an affiliate of the Debtor into a general

unsecured claim that shares pari passu with claims of creditors who never had the right to

participate in the profits of the new enterprise to be formed by the Debtor and At Home.

> **D.    At Home's Failure to Disclose the Cause of Action in Its Own Bankruptcy Bars the At Home Claim on the Grounds of Res Judicata and Judicial Estoppel.**

36.    At Home filed its own chapter 11 petition in the Northern District of California on

September 28, 2001.  There was never any disclosure in that chapter 11 case, by any party, of

any purported cause of action against the Debtor (whether for $2.2 billion or otherwise) in any of

At Home's schedules, disclosure statement, plan, or at any time during the confirmation

hearing.[37]  In fact, in support of its contentions that equity should receive no distribution, At

Home affirmatively argued that the shareholder litigation and all other litigation (plus the estate's

cash) would not generate sufficient recoveries to satisfy creditors in full (who held claims of

about $1.419 billion, at the upper range of At Home's estimates).[38]  It was only after the equity

committee objected and the At Home bankruptcy court agreed that At Home was required to

modify its plan to give equity an interest in the shareholder litigation.[39]  As part of the

amendment to modify the plan, the bankruptcy court also authorized a provision requiring the

---

[37]    Debtor's Ex. K-5, K-29 [At Home's Schedule B]; Debtor's Ex. O-7 to O-9, O-12 to O-14, O-26, O-33 to O35, O-39 ["Disclosure Statement for Debtors' Joint Chapter 11 Plan of Liquidation Dated as May 1, 2002 (June 18, 2002 Modification)" (the "At Home Disclosure Statement")]; Debtor's Ex. P-9, P-25 to P-27 ["Order Pursuant to 11 U.S.C. § 1129 Confirming the Debtor's Joint Chapter 11 Plan or Liquidation Dated as of May 1, 2002, as Modified," ¶¶ PP, 57, 60 (the "At Home Confirmation Order"), to which At Home's plan and plan exhibits are attached, titled "Debtors' Joint Plan of Liquidation (June 18 Modification), as amended by the "First Amendment to Debtors' Joint Plan of Liquidation Dated as of May 1, 2002 (June 18, 2002 Modification)," (collectively the "At Home Plan")]; Debtor's Ex. A-18, A-46 to A-48, A-53 to A-58, A-69 to A-74, A-90, A-132 to A-134, A-140 [Initial At Home Confirmation Hearing, at 14:8-12, 42-44, 49-55, 65-70, 86:15-24, 129-131, 136].

[38]    Debtor's Ex. O-4 to O-9, O-11 to O-12 [At Home Disclosure Statement (estimating less than a 50% recovery for unsecured creditors and providing not distributions to subordinated claims or equity interests)].

[39]    Debtor's Ex. P-8, P-10, P-26 to P-27 [At Home Confirmation Order, ¶¶ MM, QQ, 60]; Debtor's Ex. A-132 to A-133 [Initial At Home Confirmation Hearing, at 128:18-25, 129:10-11 (the plan "doesn't have to be modified in any way with respect to the amounts left to the trade group because there was no timely argument that was raised that they are – have any expectation of getting paid more than in full," but with ". . . respect to the bondholders' side, we're going – its going to have to be changed . . .")].

Trustee to look to the At Home bankruptcy court for instructions if the proceeds of estate

litigation other than the shareholder litigation ultimately exceed the amount necessary to pay

general unsecured creditors in full – a possibility, based on the evidence and information

submitted, that the At Home bankruptcy court believed "will never happen."[40]

37.      At Home's modified plan was confirmed on August 15, 2002, and it became

effective on September 20, 2002, with no mention of any claim against the Debtor.  About a year

later, the Trustee filed an adversary proceeding against "UnitedGlobalCom, Inc."[41]  The Debtor's

receipt of the September 26, 2003 complaint was the first communication from At Home about

the failed Excite chello negotiations since December 4, 2000.[42]  The Trustee's amended

complaint alleges that the Debtor breached the MTA as well as certain fiduciary duties that

allegedly arose from the parties' negotiations to combine various portions of the Debtor's and At

Home's businesses.[43]  The At Home Claim makes the same allegations, seeking approximately

$2.2 billion in damages.[44]

38.      In this Circuit and others, courts uniformly have recognized that the confirmation

of a plan must be accorded res judicata effect both as to claims that were raised and claims that

could have been raised in the bankruptcy proceeding.   Sure-Snap Corp. v. State Street Bank &

Trust Co., 948 F.2d 869, 873 (2d Cir. 1991).  "Consequently, the confirmation of a plan of

---

[40]      Debtor's Ex. Q at 49:5-9 [Transcript of August 14, 2002 Continued Hearing re: Confirmation of Debtors'
Joint Chapter 11 Plan of Liquidation," filed on August 30, 2002, Docket No. 2638, at 46:5-9].  Debtor's Ex. P-128
[First Amendment to the At Home Plan, Art. 12.N(16)]

[41]      The original complaint did not identify UPC as a defendant in the caption or text of the complaint, but did
identify UPC as a defendant in the Certificate of Interested Parties that constitutes the last portion of that pleading.
(Dbtor's Ex. R-10 [First Amended Complaint filed by At Home, Adv. No. 033662].)

[42]      Spangler Decl. ¶¶ 32-33.

[43]      Debtor's Ex. R-5 to R-7 [First Amended Complaint of At Home, ¶¶28-29, 35].

[44]      Debtor's Ex. S-3 to S-4 [Proof of Claim filed on behalf of the At Home General Unsecured Creditors
Liquidating Trust (describing claim as based on damages for breach of contract and breach of fiduciary duty as
stated in adversary proceeding complaint)].

reorganization prevents the subsequent assertion of any claim not preserved in the plan as

required by § 1123(b)(3) [of the Bankruptcy Code]."  Katz v. I.A. Alliance Corp. (In re I. Appel

Corp.), 300 B.R. 564, 567 (S.D.N.Y. 2003).  But a plan's general, blanket reservation of all

causes of action is insufficient to preserve "undisclosed causes of action known to [a debtor]

when he filed for bankruptcy."  Rosenshein v. Kleban, 918 F. Supp. 98, 103 n.4 (S.D.N.Y 1996);

see also D&K Props. Crystal Lake v. Mutual Life Ins. Co., 112 F.3d 257, 260-61 (7th Cir. 1997)

("blanket reservation that seeks to reserve all causes of action reserves nothing"); Browning v.

Levy, 283 F.3d 761, 774-75 (6th Cir. 2002) (finding that general reservation does not avoid res

judicata, because without identifying defendants or factual basis, court and parties in interest

cannot value reserved claims); Kelley v. South Bay Bank (In re Kelley), 199 B.R. 698, 704 (9th

Cir. B.A.P. 1996).

        39.    To preserve a claim, a debtor must identify it in some manner, although disclosure

in the schedules or disclosure statement might suffice.  See Goldin Assocs., L.L.C. v. Donaldson,

Lufkin & Jenrett Sec. Corp., 2004 WL 1119652, at *2 to *6 (S.D.N.Y. May 20, 2004) (holding

that disclosure statement's description of pending litigation and plan's blanket reservation

preserved claim); I. Appel, 300 B.R. at 570 (holding that plan's blanket reservation and

disclosure statement's description of investigation of potential claims against former shareholder

were sufficient to avoid res judicata).  Conversely, res judicata operates such that if "the debtor

fails to mention the cause of action in either his schedules, disclosure statement, or plan, then he

will be precluded from asserting it postconfirmation."  Goldin Assocs., 2004 WL 1119652, at *3

(quoting Kelley, 199 B.R. at 704).  And a blanket reservation, accompanied only by vague

references to retention of un-enumerated and unvalued causes of action against unnamed third

parties, is insufficient to avoid preclusion or to override contrary disclosure in the debtor's

schedules that no claims existed.  See Kunica v. St. Jean Financial, Inc., 233 B.R. 46, 56

(S.D.N.Y. 1999) ("general retention clauses are not convenient hiding places for debtors . . . .

The creditors have a right to know what the debtor's assets are even though the potential may be

contingent, dependent, or conditional").

  40. The failure to disclose known causes of action can also give rise to judicial

estoppel if a court, when confirming a plan or dismissing a case, adopts or relies on the asserted

non-existence of those causes of action.  See id. at 51, 57-59 (finding judicial estoppel applied to

bar action filed after bankruptcy court dismissed bankruptcy case on debtor's assertion that no

purpose would be served by its remaining in bankruptcy).  A party is judicially estopped from

asserting a factual position "when (1) that party advanced a clearly inconsistent position in a

prior proceeding and (2) that inconsistent position was adopted by the court in some manner."

Id. at 57.  Although judicial estoppel might require something more than a good-faith mistake or

unintentional error, see, e.g., Simon v. Safelite Glass Corp., 128 F.3d 68, 73 (2d Cir. 1997), the

failure to adequately disclose a claim that would cause a considerable disproportion between the

debtor's assets and liabilities suffices to infer intentional conduct.  Kunica, 233 B.R. at 59 n.6.

  41. Based on the authorities cited above, barring the At Home Claim is particularly

warranted here.  All the facts giving rise to the At Home Claim were known in December, 2000.

At Home publicly announced the MTA and filed a copy as an exhibit to its SEC filings in

September, 2000.[45]  At Home also publicly announced the termination of the MTA, held an

"investor relations" call regarding the termination in December, 2000,[46] and disclosed the

termination in its in annual report filed with the SEC.[47]  Jacquelyn Crawford, who was employed

---

[45] Debtor's Ex. T-3 to T-4 [At Home 10-Q/A filed November 17, 2000 (MTA filed as Ex. 2.02)].

[46] Pirie Aff. ¶ 5, At Home Investor Call.

[47] Debtor's Ex. C-36 [At Home 10-K for 2000].

by At Home as Treasurer at the time of the alleged breach, subsequently became the Responsible

Officer of At Home and is today the Trustee of the At Home Liquidating Trust.[48]  Other persons,

including Thomas Szabo, whom the Trustee likewise relies on in his brief, also were employed

from the date of the MTA until after confirmation of the At Home Plan, and were involved in the

sale of some of the assets to be contributed under the MTA.[49]  Thus, At Home clearly retained

corporate "knowledge" of the facts that allegedly gave rise to the At Home Claim as of the date

of its bankruptcy filing and at all times subsequent.

42.    Moreover, a month before the At Home disclosure statement was approved (and

three months before confirming the At Home Plan), the At Home court approved the

appointment of the general unsecured creditors' committee ("At Home Creditors' Committee") as

an estate representative to investigate and prosecute all estate litigation (other than the

shareholder litigation), subject to confirmation of a plan.[50]  That committee spent $205,655

pursuing Estate Litigation during the 4-1/2 months between its appointment and the effective

date of the At Home liquidating plan.[51]

---

[48]        Declaration of Jacquelyn Crawford ¶ 1.

[49]        Declaration of Thomas Szabo ¶ 1.

[50]        Debtor's Ex. U-2, U-10 to U-11 ["Order (I) Appointing Official Committee of Unsecured Creditors and
Official Committee of Unsecured Bondholders as Estate Representatives and (II) Making the Previous Orders
Concerning Compensation of Estate Professionals Applicable to the Work of the Creditors' Committees Undertaken
as Estate Representatives," filed May 13, 2002, Docket No. 1814, approving "Notice of Motion and Joint Motion of
Debtors, Official Committee of Unsecured Creditors and Official Committee of Unsecured Bondholders for Order
Pursuant to 11 U.S.C. § 105, 1103(C), 1109(B) (I) Appointing Official Committee of Unsecured Creditors and
Official Committee of Unsecured Bondholders as Estate Representatives and (II) Making the Previous Orders
Concerning Compensation of Estate Professionals Applicable to the Work of the Creditors' Committees Undertaken
as Estate Representatives," at ¶¶ 17, 21].

[51]        Debtor's Ex. V-3 ["Stipulation and Supplemental Order Regarding Debtors' Joint Chapter 11 Plan of
Liquidation (Dated as of May 1, 2002, as Modified and Amended), Confirmed on August 15, 2002," filed on Oct. 1,
2002, Docket No. 2787, ¶ 6].

43.     The At Home Creditors' Committee thus was an estate representative and had access to all of At Home's records, including privileged materials beginning in May, 2001.[52] During three mediation sessions, At Home's creditor constituencies hammered out how to divide various causes of action, including causes of action related to transactions dating back to March, 2000, and causes of action relating to the financial demise of At Home.[53]

44.     Nevertheless, At Home, its Responsible Officer, and the creditor constituencies all failed to disclose – in the schedules, disclosure statement, plan, or confirmation hearing – the $2 billion At Home Claim, a claim that if proven certainly would have related to the financial demise of At Home and significantly alter the structure of the At Home Plan. Based on the non-disclosure, the At Home bankruptcy court denied equity holders any vested right in the litigation transferred to the GUCLT, or even the right to monitor the prosecution or settlement of that litigation.[54] Significantly, the Debtor is not requesting that At Home creditors be denied any material asset. The At Home Claim is not an asset – but for "dumpster diving," it would never have been prosecuted by At Home because it did not believe that any cause of action existed. The Trustee should be barred from now taking a position inconsistent with the position its predecessors took in order to obtain confirmation of the At Home Plan. Rosenshein, 918 F. Supp. at 104 (stating that the "bankruptcy system depends on full and honest disclosure by debtors of all their assets" for voting and court approval of plan and therefore judicial estoppel was appropriate to bar subsequent litigation); D&K Props., 112 F.3d at 261 (permitting blanket reservation of undisclosed claims "would eviscerate the finality of a bankruptcy plan").

---

[52]     Debtor's Ex. P-85 to P-86 [Exhibit A to At Home's Plan, "Settlement Agreement," at ¶ 3].

[53]     Id. at P-91 [Settlement Agreement, at ¶¶ D, 8(iii)(c)].

[54]     Debtor's Ex. P-9, P-124 to P-128 [At Home Confirmation Order, ¶ OO; First Amendment to At Home Plan, Art. 12.N(2)-(5), (11), (16)]; See Also Debtor's Ex. A-90:22-24; A-132:18-35, A-133:10-16 [Initial At Home Confirmation Hearing, at 86:22-24, 128:18-25, 129:10-16].

### E.    The Trustee Cannot Enforce Its Alleged Contract.

#### (1)    The Debtor Never Signed the Trustee's Version of the Contract.

45.      The Debtor never signed the version of the MTA that the Trustee seeks to enforce.  In an almost identical recent case from this jurisdiction, the district court refused to enforce the contract at issue.  In Economist's Advocate, LLC v. Cognitive Arts Corp., the defendant signed version three of the agreement, but the plaintiff sought to enforce version four. 2004 WL 728874, *7-8 (S.D.N.Y. April 7, 2004).  The district court held that the defendant was not bound by version four.  Id. at *20.  Nor was the district court persuaded that the mere fact that the defendant's agent had attached the version three signature page to version four should require a different result because the plaintiff knew that the defendant had signed version three only.  Id. at *12-26.  Here, At Home was well aware that the Debtor's signature page was conditioned on the MTA containing the Liberty Condition.  The Trustee thus cannot enforce a different version of the MTA that omits or limits that condition.

#### (2)    The Debtor Terminated the MTA, Without Any Subsequent Ratification of the MTA.

46.      Assuming *arguendo* that the MTA was valid and contained a 10-business-day limitation on the Liberty Condition as of July 18, 2000, the Debtor repudiated or terminated that contract within such 10-day period.  After learning on July 25, 2000 for the first time of the purported 10-day limitation on the Liberty Condition, Spangler promptly informed At Home's counsel the Debtor did not execute any MTA that contained such a limitation:

> With respect to UGC's [the Debtor's] position, I sent my signature to Sherman & Sterling based on the draft they had sent to me with the revised p. 17.  The revised page 17 which includes Section 3.02 made no mention of 10 days…. [The Debtor] does not consider itself bound by the contract as amended.[55]

---

[55]     Trustee's Ex. 12 [July 27, 2000 e-mail from Ellen Spangler to Douglas Getter]; Spangler Decl. ¶¶ 6-15.

24

47.     The parties to a contract can rescind it by mutual assent.  Benson v. RMJ
Securities Corp., 683 F. Supp. 359, 373 (S.D.N.Y. 1988).  That assent can be inferred from the
attendant circumstances and the conduct of the parties.  Young v. Young, 827 A.2d 722, 727
(Conn. App. 2003); see also RESTATEMENT (FIRST) OF CONTRACTS § 406 (1932) (if either party
even wrongfully expresses wish or intention to rescind contract, and other party fails to object,
inference of assent may arise).  In this case, the Debtor repudiated any agreement that eliminated
the Liberty Condition or imposed a 10-day restriction on it.  At Home did not object to this
repudiation.  If a contract had been formed at all, it was rescinded.

48.     In the alternative, the Debtor's unequivocal statement served as a termination of
the MTA, at insofar as the version that Trustee now contends was then in force.  Under At
Home's version of MTA § 8.01, the Debtor could terminate the agreement within a two-day
window, ending August 3, 2000, if Liberty had not made a binding funding commitment by
August 1, 2000.[56]  However, before the time allotted for termination expired, the Debtor notified
At Home on July 28, 2000 that it did not consider itself "party to the agreement as amended" or
"bound by the contract as amended."[57]

49.     A method of termination need not be precise; a party need only substantially
comply with the termination provision in order to effectively terminate a contract.  See, e.g.,
Szatmari v. Rosenbaum, 490 N.Y.S.2d 97, 99-100 (N.Y. Cty. Ct. 1985) (plaintiff's "imprecise
use of words" to terminate contract was sufficient); Ameritech Info. Sys., Inc. v. Bar Code
Resources, 331 F.3d 571, 574 (7th Cir. 2003) (absolute compliance not necessary; party must
substantially comply with termination provision); Thompkins v. Stuttgart Sch. Dist. #22, 858

---

[56]     Trustee's Ex. 5 [MTA § 8.01(A), at 60-61].

[57]     Trustee's Ex. 12 [July 27, 2000 e-mail from Spangler to Getter]; Debtor's Ex. G-1 [same].

F.2d 1317, 1321 (8th Cir. 1988) ("semantical imprecision" in exercising termination provision did not render termination ineffective).

50.     Spangler's notice to At Home that the Debtor was no longer participating in the agreement if the Liberty Condition were not part of the deal constituted effective substantial termination under Section 8.01 of the MTA.  Accordingly, even if a contract such as the Trustee now claims had existed on July 18, 2000, by July 28, that particular contract had been terminated by the date specified under that contract.

51.     And the law does not support the Trustee's contention that the Debtor somehow ratified the 10-day limitation on the Liberty Condition.  Ratification is concerned with the "actual intent" of the party against whom it is pled.  See Central District Physician's Health Plan v. O'Higgins, 951 F. Supp. 352, 362 (N.D.N.Y. 1997).  The assent necessary for ratification must be clearly established and will not be inferred from "doubtful or equivocal acts or language." Economist's Advocate, LLC v. Cognitive Arts Corp., 2004 WL 728874, *9 (S.D.N.Y. 2004) (citing Holm v. C.M.P. Sheet Metal, Inc., 455 N.Y.S.2d 429, 432 (N.Y. App. Div. 1982)).  In other words, "ratification cannot be inferred from acts which may be readily explained without involving any intention to ratify."  3 AM. JUR. 2D Agency § 183; see also Young v. Data Switch Corp., 646 A.2d 852, 860 (Conn. 1994) (Norcott, A.J., dissenting) ("conduct consistent with affirmance results in ratification when it manifests a willingness to affirm the contract.  If such conduct otherwise can be explained, it does not necessarily manifest a willingness to affirm the contract").

52.     The Trustee cannot point to any conduct by the Debtor that manifested its affirmance of the 10-day limitation on the Liberty Condition.  Instead, the Debtor's actions after July 25, 2000 were entirely consistent with the Debtor's good-faith desire to resolve its business

differences underlying the proposed transaction with At Home, including the need to finalize the

Liberty funding commitment.  The Debtor had timely protested At Home's eleventh-hour

attempts to change the parties' contract, but it continued to work with At Home to close the

transaction.  This conduct was at all times consistent with the Debtor's position that there was no

ultimate obligation for either party to close the transaction without the satisfaction of the Liberty

Condition.[58]

### (3)    The MTA's Conditions to Closing Never Occurred.

53.    Even if the MTA could be interpreted to require the Debtor to close absent a

binding funding commitment from Liberty, other conditions to closing remained unsatisfied as of

the November 30, 2000 drop-dead date.  One condition to closing was that At Home not have

suffered a "Material Adverse Change."[59]  Under the MTA, such a change occurred when any

effect (a) on a party was materially adverse to its financial condition, or (b) would render

economically unfeasible any of the transactions contemplated by the MTA.[60]  According to the

Trustee's expert, the financial condition of At Home and its international assets, as with the

market generally for Internet companies, dropped considerably between July 18, 2000 and

November 30, 2000.  In fact Dubin expressed doubt that At Home remained a going concern by

December 2000.[61]  Dubin also testified that the market for initial public offerings—a transaction

contemplated by § 6.21 of the MTA—was nonexistent in 2001-2003.[62]  Thus, if Dubin and At

---

[58]    Spangler Decl. ¶¶ 26-28 (detailing At Home's efforts to remove the condition to Liberty's funding and At Home's potition that it would not accept the Debtor's signature on the MTA without Liberty funings); Trustee's Ex. 18 [August 4, 2000 Closing Checklist (supposedly expired Liberty funding listed in closing checklist)]; Trustee's Ex. 19 [November 6, 2000 letter from Ellen Spangler to Nancy Egan (indicating Liberty's response to At Home's request that Liberty fund without definitive documents)].

[59]    Trustee's Ex. 5 [MTA § 3.04(e), at 21].

[60]    Trustee's Ex. 5 [MTA § 1.01, at 8-9 (definition of "Material Adverse Effect")].

[61]    Dubin Report at 15 n.35; Dubin Depo. at 196:13-15.

[62]    Dubin Depo. at 187:11-13.

Home are to be taken at their word, the Debtor had an absolute right to terminate the transaction under Section 3.04(e) of the MTA on at least two grounds.

54.    Moreover, At Home itself had not fulfilled other conditions necessary to closing. At Home had to transfer its joint venture equity interests and certain license and other agreements to the merged entity.[63]  At Home was required to obtain any necessary consents for those transfers, but At Home informed chello in October 2000 that obtaining certain partner consents "could significantly delay closing."[64]  Although At Home tried to sidestep its obligation to transfer the license and other agreements by contending that "the closing conditions only require that Excite@Home transfer certain equity stakes . . . ."[65], the fact remains that At Home had not obtained all requisite consents by November 30, 2000.

55.    At Home also warranted that none of the commitments under the MTA conflicted in a material way with any agreement or arrangement to which any of the At Home international entities was bound.[66]  To alleviate the inconsistencies between the MTA and commitments to its joint venture partners, At Home proposed the assumption of certain obligations by the merged entity, and also some "temporary license carve-outs."[67]  The parties were still negotiating these issues and consent issues when the transaction was terminated.[68]

---

[63]    Trustee's Ex. 5 [MTA § 3.01(b)(i), at 18-19 ("At the Closing, the transactions contemplated by Annex M, including without limitation, the following transactions will be completed . . . (i) At Home and Excite Holdings shall cause the At Home Contributed Assets to be transferred into the Broadband Operating Company pursuant to the At Home Transfer documents.")].

[64]    Debtor's Ex. W-1 [October 6, 2000 letter from John O'Farrell to Roger Lynch].

[65]    Debtor's Ex. W-1 [October 6, 2000 letter from Excite&Home's John O'Farrell to Roger Lynch].

[66]    Trustee's Ex. 5 [MTA § 5.02(b), at 30-31].

[67]    Debtor's Ex. W-1.

[68]    Spangler Decl. ¶¶ 9, 22-28.

**F.      The Debtor Neither Owed Nor Breached Any Fiduciary Duties to At Home.**

56.      In order to avoid the limitations that the MTA and contract law impose on the damages that the Trustee seeks to recover, the Trustee contends that At Home and the Debtor were co-venturers in a joint venture under New York law.[69]   However, the Trustee's attempt fails for at least two reasons: (1) the Trustee fails to allege any of the basic requirements for a joint venture under New York law, and (2) the Trustee fails to allege the breach of any fiduciary duty between the purported co-venturers.

57.      Under New York law, to prove the existence of a joint venture, a party must show all of the following: (1) agreement between the parties to create a joint venture; (2) sharing of profits and losses; (3) joint control of the business; and (4) contributions of property, skill or knowledge.  Precision Testing Labs, Ltd. v. Kenyon Corp. of Am., 644 F. Supp. 1327, 1348 (S.D.N.Y. 1986).  To meet the first element, there must be "an intention of the parties to be associated together as partners, either as general partners, or for the more limited duration of a joint adventure."  Shove v. Siegbert, 267 N.Y.S. 306, 308 (N.Y. App. Div. 1933).  Here, the parties expressly disavowed any such intention.  Section 10.01 of the MTA, entitled "No Agency or Partnership" provides: "Nothing in this Agreement or the Annexes, Exhibits or Schedules hereto shall be deemed to create any partnerships or agency relationship between any Parties or between all the Parties . . . "[70]  Further, the parties did not intend to form a relationship of limited duration.  Section 8.01 of the MTA provides that the MTA is of unlimited duration: "Once the Closing has occurred, . . . this Agreement shall remain in force in perpetuity . . . ."[71]

---

[69]      Trustee's Brief at 28-30.

[70]      Trustee's Ex. 5 [MTA § 10.01, at 63-64].

[71]      Trustee's Ex. 5 [MTA § 8.01, at 61].

58.     The nature of the relationship between At Home and the Debtor under the MTA also demonstrated that the parties intended something other than a joint venture.  Each would have owned half of the ordinary and preferred shares in Excite chello N.V., each would have owned the same amount of its convertible notes, and each would have owned half of the limited partnership interests in Excite chello C.V.  Thus, At Home and the Debtor would not have been partners, as in a general partnership, nor joint venturers, as in a partnership of limited duration.  See, e.g., Shove, 267 N.Y.S. at 308.  Their relationship would have been that of shareholders and bondholders in the same company, and limited partners in the same limited partnership.  The MTA's proposed capital structure for the new enterprise, and At Home and the Debtor's express designation thereunder as shareholders and limited partners, by definition would have established something other than a joint venture.  "A joint venture is a special combination of two or more persons in some specific venture where a profit is jointly sought without any actual partnership or corporate designation . . . ."  15A N.Y. JUR. 2D Business Relationships § 1389 (2003).

59.     With respect to the second element, the parties did not agree to share profits and losses.  Rather, the parties agreed to allocate direct rights to receive dividends on the stock each would receive in the holding company, Excite chello, N.V. and distributions from the limited partnership interest each would receive in Excite chello C.V.  The sharing of profits by splitting up corporate dividends and limited partnership distributions does not by itself make shareholders or limited partners into general partners or joint venturers.  "It is not enough that two parties have agreed together to act in concert to achieve some stated economic objective.  Such agreement, by itself, creates no more than a contractual obligation, otherwise every stockholder's agreement would give rise to a joint venture."  Levine v. Personnel Inst., Inc., 138 N.Y.S.2d 243, 249 (N.Y. Sup. Ct. 1954).

60. Nor do the cases relied on by the Trustee dictate a different result. Both of the cases cited by the Trustee are factually distinguishable, as they both involved an entrustment or "coagulation" of funds for the purpose of creating the joint venture. Blank v. Baronowski, 959 F. Supp. 172 (S.D.N.Y. 1997), involved an oral joint venture agreement entered into between the plaintiff and several of the defendants (the "joint venture defendants") to acquire an offshore insurance company (TCB). The plaintiff loaned the joint venture defendants more than $120,000 for the acquisition, paid an actuarial firm to perform due diligence of TCB, and provided a variety of services to the joint venture. 959 F. Supp. at 176. In the other case, Herrick Co. v. Vetta Sports, Inc., 1996 WL 691993, 1996 U.S. Dist. Lexis 17841 (S.D.N.Y. Dec. 3, 1996), the parties to the alleged joint venture hired one attorney to assist them with the deal and each contributed money to pay the attorney's fees. The parties also contributed funds to effectuate the overall transaction. Id. at *3-6. Thus, in both cases cited by the Trustee, one or more parties entrusted money to the joint venture prior to its formation.[72]

61. In the course of pursuing a deal in this case, however, neither the Debtor nor At Home entrusted any money or other interests to the other party or to a joint entity. And, because the deal was terminated, the requisite "coagulation of property, profits or other interests" did not occur. Thus, even assuming the MTA contemplated the formation of a joint venture upon closing, the parties did not close, a joint venture was not formed, and, accordingly, no fiduciary

---

[72] Other distinguishable cases refer to pre-formation conduct supporting claims for breach of fiduciary duty. Those cases all involve situations where a joint venture was ultimately formed. See, e.g., Leroy v. Paytel, 1992 WL 367090, at *3 (S.D.N.Y. Nov. 24, 1992) ("[w]hen a plaintiff becomes a member of a partnership and a general partner takes or fails to take actions during the partnership's existence that violate representations made prior to the purchase of the limited partnership units, then a fiduciary relationship arises prior to the formation of a partnership"); Tobias v. First Nat'l Bank and Trust Company, 709 F. Supp. 1266, 1277 (S.D.N.Y. 1989) (breach of fiduciary duty claim based on pre-partnership misrepresentations sustainable where plaintiff actually became a member of the partnership); R.C. Gluck & Co. v. Tankel, 199 N.Y.S.2d 12 (N.Y. 1960) (plaintiff who was fraudulently lured into contributing money to joint venture could bring breach of fiduciary duty claim); Fouse v. Shelly, 63 S.E. 208 (W. Va. 1908) (same). In all these cases, the partnership or venture was subsequently formed, creating liability for conduct that may have occurred before formation.

obligations were created.  See In re Silverman, 155 B.R. 362, 374-75 (E.D.N.C. 1993) (rejecting

argument that fiduciary obligations are present pre-formation if partnership is never formed, and

noting that all decisions cited from other jurisdictions support premise that fiduciary duties arise

only if "a partnership was actually formed"); Radtke v. East Mequon Bus. Park Ltd. P'ship, 1997

WL 43476, at *4-5 (Wis. Ct. App. Feb. 5, 1997) (fiduciary duty is dependent on actual creation

of partnership and cannot be imposed on parties who never become partners).

　　　　62.　　Nor does the Trustee allege that At Home, a sophisticated business entity with its

own experienced counsel negotiating the deal, otherwise had reposed any particular trust or

confidence in the Debtor.  And there is no evidence of disparity of position or influence between

the parties as of the termination of negotiations in early December 2000.  See Reuben H.

Donnelley Corp. v. Mark I. Mktg. Corp., 893 F. Supp. 285, 289 (S.D.N.Y. 1995) ("Under New

York law, a fiduciary duty relationship arises when one has reposed trust or confidence in the

integrity or fidelity of another who thereby gains a resulting superiority or influence over the

first, or when one assumes control or responsibility over another.").   For all of the foregoing

reasons, the Debtor owed no fiduciary duties to At Home, whether on account of the purported

"joint venture" or otherwise.

　　　　63.　　Even assuming that the Debtor owed fiduciary duties to At Home here, the

Trustee must still lose because he fails to allege any tortious conduct of the Debtor that would

rise to the level of a breach of any such fiduciary duty to At Home.  Rather, the Trustee merely

alleges that the Debtor breached the MTA.[73]

---

[73]　　　Trustee's Brief at 31 (suggesting that the fiduciary breach comes from the Debtor's "bad faith refusal to
proceed with the MTA"); Debtor's Ex. S-3 to S-4 [Trustee's Proof of Claim ("Although At Home diligently sought
to close the MTA, by November, 2000, Old UGC had determined to breach the agreement, and refused to cooperate
with At Home to close the transaction.  Ultimately, Old UGC unequivocally breached, resulting in the termination of
the MTA on December 5, 2000. . . . Old UGC's conduct after the signing of the MTA, including but not limited to
its refusal to act in good faith and cooperate with At Home to close the transaction, constituted a breach of its
fiduciary duties to At Home.").

64.    "A cause of action for breach of fiduciary duty which is merely duplicative of a breach of contract claim cannot stand." William Kaufman Org., Ltd. v. Graham & James, LLP, 703 N.Y.S.2d 439, 442 (N.Y. App. Div. 2000). A breach of fiduciary duty claim may co-exist with a contract claim only when the defendant has engaged in some tortious conduct separate and apart from its failure to fulfill its contractual obligations. New York Univ. v. Continental Ins. Co., 662 N.E.2d 763, 767, 639 N.Y.S.2d 283, 287 (1995). Where a party is "merely seeking to enforce its bargain, a tort claim will not lie." Id. at 288.[74] In the instant case, the Trustee does not allege any fraudulent or other wrongful conduct by the Debtor beyond its alleged breach of the MTA.

65.    In Scholastic Inc. v. Harris, 80 F. Supp. 2d 139 (S.D.N.Y. 1999), the parties to a joint venture parted ways and the plaintiff sued his partner for breach of the joint venture agreement and for breach of fiduciary duty. Id. at 145-46. The court determined that the allegations of breach of fiduciary duty were identical to the allegations supporting the breach of contract claim. Because the plaintiff was not alleging a breach of a duty distinct from, or in addition to, the breach of contract, the tort claim was dismissed. Id. at 152 (citing Layden v. Boccio, 253 A.D.2d 540, 541 (N.Y. App. Div. 1998)).

66.    Similarly, in Banco Espirito Santo de Investimento v. Citibank, N.A., 2003 WL 23018888 (S.D.N.Y. Dec. 22, 2003), the plaintiff banking institution sued Citibank for $25 million after its investment in two structured finance funds created and managed by Citibank suffered unanticipated losses. Id. at *1-3. The plaintiff's breach of fiduciary duty claim alleged

---

[74]    Cf. Meyers v. Waverly Fabrics Div., 489 N.Y.S.2d 891, 894 n.2 (Ct. App. 1985)(noting that a contracting party may be charged with a separate tort liability arising from a breach of duty, distinct from, or in addition to, the breach of contract, "as when it springs 'from extraneous circumstances, not constituting elements of the contract as such although connected with and dependent on it, and born of that wider range of legal duty which is due from every man to his fellow, to respect his rights of property and refrain from invading them by force and fraud.'" (quoting Rich v. New York C. & H. R. R.R. Co., 87 N.Y. 382, 398 (1882)).

that Citibank had failed to adequately supervise and manage the entities.  But, as the court held,

those same allegations formed the basis of the plaintiff's breach of contract claim.  Because the

plaintiff was seeking merely to enforce the benefit of its bargain, the court dismissed the breach

of fiduciary duty claim because it was not a colorable claim.  Id. at *15-16.  The Court should

reach the same result here.

       **G.**      **The Trustee's Predecessor Suffered No Recoverable Damages.**

             **(1)**       **The MTA Bars Substantially All of the Trustee's Claimed Damages.**

67.    The version of MTA on which the Trustee bases his claim bars the recovery of

special and consequential damages.  Thus, the Trustee's claims for billions of dollars in lost

profits is barred on the face of the MTA.  Specifically, the MTA provides in pertinent part:

> Section 7.05  Limitation on Damages:
>
>     (a)    Limitation on Damages.  NO PARTY SHALL BE LIABLE
> FOR ANY INDIRECT, SPECIAL, INCIDENTAL OR
> CONSEQUENTIAL LOSS OR DAMAGE (INCLUDING, WITHOUT
> LIMITATION, LOSS OF PROFITS OR LOSS OF USE) SUFFERED BY
> ANY OTHER PARTY ARISING FROM OR RELATING TO A
> PARTY'S PERFORMANCE, NON-PERFORMANCE, BREACH OF OR
> DEFAULT UNDER A COVENANT, WARRANTY,
> REPRESENTATION, TERM OR CONDITION HEREOF.  EACH
> PARTY WAIVES AND RELINQUISHES CLAIMS FOR INDIRECT,
> SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES.  THE
> LIMITATIONS ON LIABILITY AND DAMAGES SET FORTH IN
> THIS SECTION APPLY TO ALL CAUSES OF ACTION THAT MAY
> BE ASSERTED HEREUNDER, WHETHER SOUNDING IN BREACH
> OF CONTRACT, BREACH OF WARRANTY, TORT, PRODUCT
> LIABILITY, NEGLIGENCE OR OTHERWISE.[75]

68.    This damages limitation provision is valid and enforceable under New York law.

Metropolitan Life Insurance Company v. Noble Lowndes International, Inc., 600 N.Y.S.2d 212,

215 (N.Y. App. Div. 1993) (holding "in a strictly commercial context, a provision limiting

---

[75]    Trustee's Ex. 5 [MTA § 7.05, at 60].

recovery is enforceable according to its terms unless the special relationship between the parties, a statute or public policy imposes liability."), aff'd, 643 N.E.2d 504 (N.Y. 1994); see also Peluso v. Tauscher Cronacher Prof. Eng'rs, P.C., 704 N.Y.S.2d 289, 290 (N.Y. App. Div. 2000) (slip opinion); Alleyne v. Four Seasons Hotel – New York, 2001 WL 135770, at *17 (S.D.N.Y. Feb. 15, 2001).

69.     In Noble Lowndes, a seller intentionally breached a contract to develop a computer software system.  The plaintiff argued that a "limitations of liability" provision in the contract should not be given effect because the breach was intentional.  600 N.Y.S.2d at  216. The court disagreed, finding the "plaintiff has proved no more than a breach of contract, albeit deliberate."  Id. at 214. "Even if it could be shown that defendant entered into the contract with plaintiff fully intending never to perform its obligation thereunder, the damages recoverable are still limited to those specified in the contract."  Id. at 215.  Noble Lowndes thus explicitly rejects the Trustee's notion that an intentional abandonment of an agreement in order to maximize profits to the breaching party or prevent further loss is "tortious conduct" which would relieve the non-breaching party "of the consequences of a contractual provision negotiated at arm's length between sophisticated business entities." Id.  (quoting Gross v. Sweet, 49 N.Y.2d 102, 108 (1979)).  Thus, even if the Trustee were correct that the Debtor made a "strategic decision" not to pursue the MTA in fall 2000,[76] the damage limitation provision in the July 18, 2000 MTA is nonetheless effective against the Trustee.

70.     Under that provision, At Home was entitled to recover "direct" damages only--not consequential or incidental damages.  Consistent with New York law, the contractual provision specifically includes within the definition of consequential damages "loss of profits" and "loss of

---

[76]        Trustee's Brief at 32.

use."  See Arell's Fine Jewelers, Inc. v. Honeywell, Inc., 566 N.Y.S.2d 505, 509 (N.Y. App. Div.

1991) (loss of future business opportunities are indirect or consequential damages); Streamline

Capital, LLC v. Hartford Cas. Ins. Co., 2003 WL 22004888, at *4 (S.D.N.Y. Aug. 25, 2003)

(lost opportunities deemed consequential damages); Tevdorachvili v. Chase Manhattan Bank,

103 F. Supp. 2d 632, 640-41 (E.D.N.Y. 2000) (lost business opportunity deemed a consequential

damage); Rose Lee Mfg., Inc. v. Chem. Bank, 588 N.Y.S.2d 408, 410 (N.Y. App. Div. 1992)

(lost profits described as consequential damages).  Accordingly, even if the MTA were deemed

to be an enforceable agreement, which the Debtor had intentionally breached, the Trustee cannot

now recover any consequential damages including loss of profits, loss of use, or loss of

opportunity.

71.     To the extent that the Trustee seeks to use valuation as a measure of any damages

he claims, he is seeking to recoup lost profits, which are specifically barred by the MTA.

Reduced value is merely another way to describing a decrease in expected profits—in order

words, lost profits.[77]

**(2)     At Home Suffered No "Benefit of the Bargain" Losses as a Result of
the Failed Transaction.**

72.     Despite the clear damage limitations imposed by the MTA, the Trustee argues

that it is entitled to the "benefit of the bargain"—which it defines as the amount of money

necessary to put it in the same economic position it would have been in had the breaching party

fulfilled the contract.[78]  According to the Trustee, this number is an amount "no less than $1.48

billion [] and up to $2.48 billion."[79]  Notwithstanding that the Trustee cannot prove the existence

---

[77]     Braun Report at 10, attached to Declaration of Richard S. Braun; Dubin Depo. at 206:9-207:23.

[78]     Trustee's Brief at 32.

[79]     Trustee's Brief at 34.

of his claim and that such a claim, as one for lost profits, would in any event be barred by the MTA, his damage computation is pure fantasy.

73.     In order to be entitled to expectation or "benefit of the bargain" damages, a plaintiff must show that (1) the loss was the proximate result of the breach, (2) a sufficient basis exists for estimating the amount of the loss with reasonable certainty, and (3) the loss incurred was within the reasonable contemplation of the parties at the time of the contract.  Energy Capital Corp. v. United States, 302 F.3d 1314, 1325 (Fed. Cir. 2002).  See also Kenford Co. v. County of Erie, 493 N.E.2d 234, 235 (N.Y. 1986) (damages must be demonstrated "with certainty" to have been caused by breach, must be capable of proof with "reasonable certainty," and must have been fairly within the contemplation of the parties).  Furthermore, it is fundamental that the non-breaching party may not recover more from the breach than the party would have gained had the contract been performed.  Freund v. Washington Square Press, Inc., 34 N.E.2d 419, 421 (N.Y. 1974).  The Trustee's claim for damages fails on every front.

> **(a)     The Debtor's Alleged Failure to Close the Deal did not Proximately Cause any Damages.**

74.     The Trustee bears the burden of proving the causal relationship between the breach of contract and the damages claimed.  Jorgensen v. Century 21 Real Estate Corp., 629 N.Y.S.2d 268, 269-70 (N.Y. App. Div. 1995).  A plaintiff seeking damages for breach of contract must prove that the damages were caused by and are directly traceable to the breach, rather than the result of intervening causes.  Bausch & Lomb, Inc. v. Bressler, 977 F.2d 720, 731 (2d Cir. 1992); Treasure Lake Assoc. v. Oppenheim, 993 F. Supp. 217, 220 (S.D.N.Y. 1998).

75.     Thus, the Trustee must demonstrate that the Debtor's failure to close the transaction was the proximate cause of At Home's purported damages.  But the Trustee's own evidence precludes such a showing.  At Home's expert opined that the general decline in the

market caused a significant reduction in the value of At Home's international assets from July

2000 to December 2000.[80]   However, as of December 5, 2000, the approximate date of the

Debtor's alleged breach and after the decline had occurred, At Home's international assets

nonetheless  purportedly "had an estimated market value [of] $1.69 to $2.86 billion."[81]

76.      According to the Trustee's assumptions, which assume that this was a "merger of

equals," chello's own assets must have declined in value at a comparable rate.  Therefore, the

merged entity, had the closing occurred, would have had a market value of $3.37 to $5.72

billion.[82]  Per the Trustee's expert, as the 45% owner of the merged entity, At Home would have

owned assets valued at approximately $1.52 to $2.57 billion at the time of the closing.  Thus, had

the Debtor performed, and At Home reaped the benefit of its bargain, on the date of closing it

would have owned assets worth *less* that the assets it retained immediately following termination

of the MTA.  Accordingly, the Debtor's failure to consummate the transaction did not

proximately cause any of At Home's economic loss up to the date of the supposed breach.

77.      Perhaps recognizing the paradoxical conclusion of its own expert, the Trustee

next claims that he should recover damages measured by the market decline in the value of the

At Home international assets occurring over a nine month period *subsequent* to the alleged

December 2000 breach.  According to the Trustee, At Home ultimately sold its international

assets for $36 million in September 2001.[83]  The Trustee argues he should receive as damages

the difference between the value of its assets on December 5, 2000, the date of the Debtor's

---

[80]      Trustee's Brief at 33 (citing Dubin Report at Ex. 9, col. F).

[81]      Id. (citing Dubin Report at Ex. 9, col. G).

[82]      Id.

[83]      Id. at 34.  The Trustee fails to note the various asset write-downs, layoffs, business closures, and last-resort financing that occurred between termination of the MTA and At Home's efforts to sell its international assets. (Debtor's Ex. C-37, C-47 to C-48 [At Home 10-K for 2000 (layoffs, closure of work.com, and write-down of $4.6 billion of goodwill assets)]; Debtor's Ex. O-10 to 0-13 [At Home Disclosure Statement (events leading to bankruptcy)].)

alleged breach, and the date in 2001 when it sold its assets.  That theory is entirely inconsistent

with New York law.

78.     Instead, the proper measure of damages for breach of a merger agreement is the

difference between the value of the assets had the contract been performed and the market value

of the assets *on the date of the breach*.  See RUS, Inc. v. Bay Indus., Inc., 2004 WL 1240578,

*24 (S.D.N.Y. May 25, 2004) (damages for breach of contract to buy company measured at time

of breach).  New York courts reject damage awards "based on what 'the actual economic

conditions and performance' were in light of hindsight."  Lucente v. Int'l Bus. Machs. Corp., 310

F.3d 243, 262 (2d Cir. 2002) (quoting Sharma v. Skaarup Ship Mgmt. Corp., 916 F.2d 820, 825

(2d Cir. 1990)).  Economic or business performance after the date of breach is not a permissible

consideration in calculating damages.  See Aroneck v. Atkin, 456 N.Y.S.2d 558, 559 (N.Y. App.

Div. 1982) (rejecting claim that value of securities should be based on performance of business

in 1979 and 1980 rather than at time of breach when value was $0); Webster v. DiTrapano, 494

N.Y.S.2d 550, 551 (N.Y. App. Div. 1985) (in contract to buy real estate, measure of damages is

difference between contract price and fair market value at time of breach, even though seller was

only able to sell real estate later and for less than value on date of breach); Simon v. Electrospace

Corp. Rus, Inc. v. Bay Indus., Inc., 2004 WL 1240578 at *16 (S.D.N.Y. May 25, 2004) (plaintiff

is to be made whole at the time of the breach, and subsequent changes in value should not

change damage calculus).

79.     Although the Braun Report casts substantial doubt on the numeric values Dubin

uses because of Dubin's wholesale adoption of an investment banker's presentation as

establishing a fair market value of At Home's international assets, Dubin's own conclusions as to

"market value" show no damages at the time of the breach.[84]  Those assets had an estimated

market value *greater* than the anticipated value of At Home's ownership interest in the merger,

had it closed.[85]  What happened after the breach is simply not relevant to the damages

calculation.

### (b)   The Trustee's Alleged Proof of Damages Is Too Speculative.

80.   Without any evidentiary support, the Trustee contends that the new enterprise to

be formed by the parties would have fared better than At Home did separately, and that the

Trustee should recover damages for this lost opportunity.  This contention is based exclusively

on the conclusory and unsubstantiated statement of Dubin at p. 17 of his report that, "[t]he

combined company, Excite-chello ***may have been*** strong enough to weather the storm and leave

At Home International as a partner with chello and Europe's key ISP supplier."[86]

81.   This notion fails for at least two reasons.  First, it is inconsistent with Dubin's

report and his deposition testimony.  Dubin admitted, after all, that "[a] consummated merger (or

strategic alliance) for At Home/chello in the second half of 2000 would have likely produced a

combined company whose aggregate market value by year-end would have suffered in much the

same way as the tech market generally in Europe."[87]  During his deposition, Dubin likewise

conceded "that the combined entity would have suffered the same way as the tech market

generally in Europe . . . ."[88]

---

[84]   Braun Decl., at 2-9 of Braun Report.

[85]   Dubin Report at 17 ("Hence, a conservative estimate of At Home International's retained value [after closing] is 90 percent of its asset contribution.").

[86]   Dubin Report at 17 (emphasis added).

[87]   Dubin Report at 16-17.

[88]   Dubin Depo. at 180:15-18.

82.     Second, the Trustee's unsupported allegations are not sufficient to meet the legal standard for the recovery of damages.  To be recoverable "damages must be not merely speculative, possible and imaginary, but they must be reasonably certain . . . ."  Najjar Inds. v. City of New York, 87 A.D.2d 329, 334, 451 N.Y.S.2d 410, 414-15 (N.Y. App. Div. 1982) (quoting Wakeman v. Wheeler & Wilson Mfg. Co., 101 N.Y. 205, 209, 4 N.E. 264) (N.Y. 1886)) (holding that certain, imaginary, and contingent damages incapable of adequate proof cannot be recovered).  Conjecture and guesswork cannot be the basis for an award of damages. Schanbarger v. Edward Dott's Garage, 421 N.Y.S.2d 937, 937 (N.Y. App. Div. 1979); Schneider v. State of New York, 327 N.Y.S.2d 60, 61 (N.Y. App. Div. 1971).  The Trustee's expert's view that the combined company "may have been" stronger than the At Home international assets alone is nothing but guesswork.  This guesswork is itself undermined by the fact that at the time of the alleged breach, At Home itself did not feel "any pressure whatsoever" to find another merger partner, and was "confident" that it could continue its own international growth without chello.[89]  Things turned out differently.  The idea that a merged entity would have survived or ever been profitable is pure speculation.  It cannot be the basis for a damages award.

83.     For similar reasons, the Trustee's alternative request for $2 billion in reliance damages is not recoverable.  Essentially, the Trustee argues that, in July 2000, At Home could have sold its International Assets for more than $3 billion, but that instead of pursuing such an opportunity, it agreed to combine those assets with chello.  Four months later, when the deal with the Debtor fell through, At Home was no longer able to sell the same assets for $3 billion.

84.     This argument is fatally flawed because the Trustee's estimation of At Home's loss has no evidentiary basis.  The Trustee insists that in July 2000, At Home had the ability to

---

[89]     At Home Investor Call at 1, attached to Pirie Aff.

"attract a number of different opportunities for its International Assets," including the Princes

Gate II transaction, the UGC/chello venture, or "other opportunities."[90]  If At Home did in fact

have "other opportunities," the Trustee has not said a word about them.  There were, apparently,

no buyers interested in paying $3 to $4 billion for At Home.

85.     Rather, the scant evidence indicates that if At Home had not pursued a deal with

the Debtor and chello, its only other option was the Princes Gate II transaction.  The Princes

Gate II transaction contemplated developing At Home's international Internet portal business.[91]

According to the Trustee's expert, international Internet values were declining rapidly across the

board.  There is no evidence that if At Home had entered into the venture with Princes Gate, or

any other investor, it would have fared any better.  Alleged damages "may not be merely

speculative, possible or imaginary, but must be reasonably certain and directly traceable to the

breach, not remote or the result of other intervening causes."  Tevdorachvili, 103 F. Supp. 2d at

641 (citing Kenford v. County of Erie, 493 N.E.2d 234, 235 (N.Y. 1986)).  The Trustee has

failed to prove these claimed "reliance" damages with reasonable certainty or that the damages

were directly traceable to the Debtor's failure to close the deal.

86.     Even assuming the Trustee could prove that the Princes Gate II opportunity were

viable, the Trustee's claim for $166.7 million as a result of the loss of that transaction is also too

speculative.  The only evidence that At Home would have entered into the Princes Gate II deal is

a draft term sheet from December 1999 that contains several open issues, including the definition

of "Excite."[92]  Given market declines in months subsequent to December 1999, it is likely the

Princes Gate principals would have reconsidered their decision to consummate the transaction.

---

[90]     Trustee's Brief at 39.

[91]     Trustee's Ex. 43 [Project Domino Draft Term Sheet (Version 5.2)].

[92]     Id. at 1.

Moreover, had the deal closed, At Home would have been a 40% owner of its international

internet portal business.[93]  At Home proposed to contribute all of its Excite international assets

and its Australian access business for a contribution of $250 million from Princes Gate (over

several installments, assuming various milestones were reached).[94]  But At Home also would

have been obligated to buyback the other 60% at a guaranteed rate of return, conduct an IPO, or

sell its own stake within five years.[95]  Based on Mr. Dubin's conclusions about the broad decline

in international internet stocks during the year 2000, there is no evidence that At Home's

contemplated transaction with Princes Gate (or any other potential joint venture) would have left

At Home in a better position than the one it found itself in when the chello transaction was

terminated in December 2000.  The Trustee's assertion that "under the lost value method, At

Home is entitled to no less than $166.7 million in damages" has no basis in either law or fact.

### (c)    Lost Expectation Damages in the Billions Were Not Contemplated by the Parties.

87.    In order to obtain expectation damages, a plaintiff must prove that the loss

incurred was within the contemplation of the parties at the time of contracting.  "The evident

purpose of this well-accepted principle of contract law is to limit the liability for unassumed risks

of one entering into a contract and, thus, diminish the risk of business enterprise."  Mathias v.

Jacobs, 238 F. Supp. 2d 556, 578 (S.D.N.Y. 2002) (quoting Kenford v. County of Erie (Kenford

II), 537 N.E.2d 176 (N.Y. 1989)).  New York courts have repeatedly declined to award

consequential damages where there is insufficient evidence that the parties contemplated such

losses.  See, e.g., Streamline Capital v. Hartford Ins. Cas. Co., 2003 WL 22004888,  at *7

---

[93]    Trustee's Ex. 43.

[94]    Id. at 4-5 ("Strategic Partner Contribution").

[95]    Id. at 7-9 ("Strategic Clawback Right," "Buyback Right," "Buyback Price," "Non-exercise of Buyback Right").

(S.D.N.Y. Aug. 25, 2003) (dismissing insured's claim for consequential damages against insurer based on lost business opportunities because no evidence that parties contemplated such loss and contract contained limitation on damages provision); Tevdorachvili v. Chase Manhattan Bank, 103 F. Supp. 2d 632, 641 (E.D.N.Y. 2000) (though plaintiff might prove amount of consequential damages from bank error, no evidence that bank was "aware of any of the business ventures [plaintiff] had to forego as a result of losing access to the funds at issue" and, thus, damages based on lost opportunities not recoverable); Trademark Research Corp. v. Maxwell Online, Inc., 995 F.2d 326, 333 (2d Cir. 1993) (fact that breaching party knew "there was a large downside risk" for plaintiff if contract terminated "militate[d] against the idea that [defendant] would have embraced" such a risk and thus lost profits not recoverable); Sweazey v. Merchants Mut. Ins. Co., 571 N.Y.S.2d 131, 132 (N.Y. App. Div. 1991) (dismissing insured's claim for damages for disruption of business and use of living quarters after insurance company failed to promptly pay claim because policy did not demonstrate that recovery for such loss within contemplation of parties); Kenford v. County of Erie, 493 N.E.2d 234, 236 (N.Y. 1986) (despite "massive" proof of lost profits, no recovery permitted because liability for loss of profits from failure to build stadium not contemplated by parties).

88.     In this case, there is no evidence the parties contemplated responsibility for damages in the ranges sought by the Trustee, whether in the range of tens of millions or billions of dollars, as a result of either party's failure to proceed with the transaction. The damages limitation provision of the MTA is broad, covering all claims, whether in tort or contract or otherwise, and written in all capital letters to underscore its importance and to ensure that it was understood by the negotiators.[96]

---

[96]     Trustee's Ex. 5 [MTA § 7.05, at 60].

89.     Undaunted, the Trustee nevertheless claims that he can still recover "lost asset damages," apparently trying to distinguish such damages from lost profits.[97]  Notwithstanding the new label, this damage claim fails as well, for the same reasons.  Specifically, the Trustee claims that the "asset" At Home lost because of the Debtor's alleged breach was the ability to enter into "other deals" than the Excite-chello merger.[98]  An opportunity foregone is not the kind of "lost asset" for which the asset value measure of damages applies.  See Schonfeld v. Hilliard, 218 F.3d 164, 176-77 (2d Cir. 2000).  Schonfeld instructs that asset value damages apply where a plaintiff is denied a potentially income-producing asset (such as a supply contract) but lost profits from the asset are too speculative to recover.

90.     Rather, the "lost asset" measure of damages merely serves as a "proxy" for the lost profits the plaintiff would have recovered under a lost profits theory.  Id. at 178.  As with all such damages, the plaintiff must still prove that liability for the lost asset was within the contemplation of the parties at the time of contracting.  Id. at 177; see also 22 AM. JUR. § 281 "Consequential Damages" (citing Schonfeld, for the proposition that "a plaintiff seeking consequential damages for loss of an income-producing asset must prove that liability for the loss of the asset was within the contemplation of the parties at the time the contract was made, and the asset's value should be proven with reasonable certainty").

91.     Here, it was the 45% interest in the merged Excite-chello entity that was in the contemplation of the parties, rather than  the hypothetical Princes Gate II deal.  As noted above, At Home's own expert acknowledges that the proposed merger was worth less than the assets At Home retained—thus, no damages.

---

[97]     Trustee's Brief at 40-41 (suggesting At Home is entitled to "no less than" $166.6 million under this measure).

[98]     Trustee's Brief at 41 (citing the Princes Gate II deal as the other opportunity available to At Home).

### (3)    The Trustee is Not Entitled to Its Claimed Reliance Damages.

92.    Again attempting to skirt the express provisions of the very contract the Trustee

seeks to enforce, the Trustee offers a reliance theory of damages to recover for alleged operating

losses and miscellaneous expenses.[99]  It is axiomatic with this doctrine of recovery that the

non-breaching party incur damages *in reliance on* promises contained in the contract – that is,

but for the contract, the plaintiff would not have incurred the expenses for which he seeks

reimbursement.  See McKinley Allsopp, Inc. v. Jetborne Int'l, Inc., 1990 WL 138959, at *9

(S.D.N.Y. Sept. 19, 1990) (allowing recovery of reliance damages where plaintiff proved that

"but for [defendant's] breached promises," plaintiff would not have incurred expenses); Shovel

Transfer and Storage, Inc. v. Penn. Liquor Control Bd., 739 A.2d 133 (Pa. 1999) (reliance

damages available where party has "changed his position in reliance on the contract").

93.    Furthermore, the reliance measure of damages can never exceed the party's

expectation interest.  Bausch & Lomb v. Bressler, 977 F.2d 720, 729 (2d Cir. 1992).  For that

reason, courts will not award reliance damages if such recovery would put the plaintiff in a better

position than he would have occupied had the contract been fully performed.  Id.; see also

Interfilm, Inc. v. Advanced Exhibition Corp., 672 N.Y.S.2d 309, 310 (1st Dep't 1998) (declining

to award reliance damages because plaintiff would have been better off than if contract

performed).  To prevent a windfall to the plaintiff, reliance recovery will be "offset by the

amount of 'any loss that the party in breach can prove with reasonable certainty the injured party

would have suffered had the contract been fully performed.'"  Bausch & Lomb, 977 F.2d at 729

(citing RESTATEMENT (SECOND) OF CONTRACTS § 349 (1979)); see also Scott v. Grinnell Mutual

Reinsurance Co., 653 N.W.2d 556, 562-63 (Iowa 2002) ("[r]eliance damages are not designed to

---

[99]    Trustee's Brief at 34-38.

rescue the plaintiff from the consequences of a bad bargain").  "If the breaching party establishes

that the plaintiff's losses upon full performance would have equaled or exceeded its reliance

expenditures, the plaintiff recovers nothing under a reliance theory."  Bausch & Lomb, 977 F.2d

at 729.

94.     First, the Trustee is not entitled to reliance damages for operational losses because

there is no evidence that At Home incurred losses during the period from July to December 2000

*in reliance on* the MTA.  Specifically, the Trustee claims that At Home should be awarded $27.9

million as reimbursement for losses from July to December 5, 2000.[100]  To recover these costs as

reliance damages, however, the Trustee must prove that "the contract undertaking itself caused

[its] expenditures or losses . . . ."  Westfed Holdings, Inc. v. United States, 52 Fed. Cl. 135, 155

(2002).  The burden of proof as to causation is on the Trustee.  Hansen Bancorp, Inc. v. United

States, 53 Fed. Cl. 92, 99 (2003).   In his brief, the Trustee declares, without citation, that "[in]

the absence of the MTA, At Home would have (1) found another partner or (2) obtained

significant capital, either of which would have eliminated At Home's obligation to continue to

fund, and absorb the losses of, the At Home International Assets."[101]  This bald assertion is not

accompanied by an iota of evidence to support it.  At Home operated its companies prior to July

2000 and it continued to operate its companies following termination of the MTA.  At Home's

Chief Financial Officer on the date of termination of the merger expressed no urgency in either

disposing of At Home's international assets or finding another partner.[102]   There is no evidence

that At Home changed its position and continued to operate its businesses "only in the ordinary

---

[100]     Trustee's Brief at 38.

[101]     Id.

[102]     At Home Investor Call, attached to Pirie Aff.

course of business and in a manner consistent with past practice,"[103] merely to perform under the

MTA.  Because the Trustee cannot show that the decision to operate its international assets from

July to December 2000 was made in reliance on the MTA, he cannot recover reliance damages.

95.    Second, the Trustee's alleged reliance damages do not conform to the MTA.  The

reimbursement provision of the MTA, section 6.20(d), covered only the period from October 1,

2000 until closing or termination.  At Home would have been entitled to one half of the amount

by which its expenditures exceeded chello's.[104]  Chello's profit and loss statements from October,

November, and the first five days of December 2000, calculated on a straight line basis, yield US

dollar losses of $8.73 million, $7.62 million, and $2.57 million, for a total $18.92 million in

losses.[105]  At Home's losses for the same period were only $14 million.[106]  At Home, therefore

would have incurred not only the losses it seeks as reliance damages, but also would have paid

chello an additional $2 million.  The Trustee cannot be said to have incurred its operating losses

in "reliance" on the MTA when the MTA plainly prohibits their recovery.

96.    The same is true for the other categories of expenses claimed by the Trustee.  For

example, the Trustee also claims as damages $12.97 million for documented costs and expenses

incurred in connection with the Excite-chello merger.[107]  Of this amount, $3.8 million was spent

---

[103]    Trustee's Ex. 5 [MTA § 6.20(a), at 51].

[104]    Trustee's Ex. 5 [MTA § 6.20(d), at 55].

[105]    Declaration of Marc Seignette Ex. 1 [Monthly profit and loss statement covering the months of July to December, 2000 (showing losses of $14.74 million eurors, 14.53 million euros, and 10.73 million euros for October, November, and December, 2000)].  These amounts were converted to US dollars based on the average conversion rate from October 1 to December 5, 2000, a copy of which is located at Debtor's Ex. B-42.

[106]    Trustee's Ex. 34 [Operating Loss Prorated from July 18, 2000 to December 5, 2000].  At Home's assets lost $17.45 million in the 4th Quarter of 2000.  (Holtzman Decl. ¶ 11.)  Subtracting out December losses and adding back in the first four days of December gives losses from October 1 to December 5, 2000 of $14.06 million. (Holtzman Decl. ¶11-12.)  Applying the formula, At Home would have owed UPC $2.43 million had the deal closed ((18.92-14.06)/2).

[107]    Trustee's Brief at 36.

before the July 18, 2000 date when the MTA was alleged to have been executed.[108]  This amount

is clearly not compensable, as there can be no argument that it was spent "in reliance" on any

promise made by the Debtor.  See, e.g., Durkee v. Mott, 8 Barb. 423 (N.Y. Gen. Term 1850) (no

reliance damages allowed for anything before the contract formed).  For similar reasons, the

internal costs for salary and benefits the Trustee alleges between July 18, 2000 and December 5,

2000, were costs At Home would have paid whether the employees worked on the MTA, on

other business, or simply surfed the internet.

97.     The balance of alleged reimbursements claimed by the Trustee include at most

$8.164 million in costs and expenses.  The Trustee appears to rely on MTA Section 10.02(a),

which detailed the circumstances and procedures under which the Parties could be reimbursed

after closing.[109]  Absent the closing, each party was to bear its own fees and expenses.[110]  Since

the closing never occurred, the Trustee should be entitled to no payment based on this contract

section.

98.     In addition, the MTA provided that the reimbursing party was to be the merged

entity, to be owned approximately 50% each by At Home and UPC.  Thus, this payment was to

be more of an accounting shift of costs from parents to merged entity, rather than any true net

gain for either parent.  The Trustee cannot seek reliance damages for costs and expenses when it

would have ultimately borne the cost of these expenses via a decreased value of the merged

entity it was to own had the merger transaction gone through.  This violates a fundamental

principle of reliance damages, that such damages are not intended to leave the plaintiff better off

---

[108]     Id. at 37.

[109]     Trustee's Ex. 5 [MTA § 10.02(a), at 64].

[110]     Id. [MTA §10.02(a), at 64 ("all costs and expenses . . . incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the Party incurring such costs and expenses; provided, however, that if the Closing occurs. . . ")].

than if the contract were fulfilled.

99.     Finally, to be entitled to "reliance damages" a party's reliance must be reasonable. As detailed above, before the end of July 2000, the Debtor advised At Home unequivocally that the Debtor never signed, did not consider itself a party to, and did not consider itself bound by any agreement that included a 10-day limitation to the Liberty Condition.[111]  This clear message gave notice to At Home that it was proceeding with the transaction at its own risk that Liberty would not agree to fund.  For the Trustee to suggest that At Home's continued negotiation and incurrence of expenses was "in reliance" on a provision that the Debtor repudiated within days of the alleged signing is therefore absurd.

### (4)     The Trustee Is Not Entitled to Punitive Damages.

100.     Under New York law, punitive damages are not generally available for breach of contract.  Hudson Motors Partnership v. Crest Leasing Enters., 845 F. Supp. 969, 974 (E.D.N.Y. 1994) (punitive damages generally not available because such actions deal with wrongs between private parties).  The Trustee makes no allegations that require deviation from this rule.  There is thus no basis for punitive damages in this case.

### CONCLUSION

101.     The At Home Claim arose out of "dumpster diving," and the Trustee expected to turn up nothing.  The Debtor requests that the Court enter an order that satisfies that expectation.

---

[111]       Spangler Decl. ¶¶ 9-15; Trustee's Exs. 12, 13.

**WHEREFORE,** the Debtor respectfully requests that the Court enter an

order estimating the At Home Claim at zero and granting such other relief as is just and

proper.

Dated:  New York, NY
       June 30, 2004

KRONISH LIEB WEINER & HELLMAN LLP
1114 Avenue of the Americas
New York, NY 10036
Telephone (212) 479-6000

_/s/ Jay R. Indyke_____ _
Jay R. Indyke (JI 0353)
A member of the Firm